09-3742-cv, 09-3787-cv
Commodity Futures Trading Commission v. Walsh, Securities and Exchange Commission v. WG Trading Investors, L.P.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2009

(Argued in tandem: May 28, 2010                    Question Certified: August 13, 2010)

Docket Nos. 09-3742-cv, 09-3787-cv

(Consolidated for disposition)

COMMODITY FUTURES TRADING COMMISSION,

*Plaintiff-Appellee,*

— v.—

STEPHEN WALSH, PAUL GREENWOOD, WESTRIDGE CAPITAL
MANAGEMENT, INC., WG TRADING INVESTORS, L.P., WGIA, L.L.C., WESTRIDGE
CAPITAL MANAGEMENT ENHANCEMENT FUNDS, WG TRADING COMPANY L.P., WGI
L.L.C., K&L INVESTMENTS,

*Defendants,*

JANET WALSH,

*Relief Defendant-Appellant.*

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

— v.—

WG TRADING INVESTORS, L.P., WG TRADING COMPANY, LIMITED
PARTNERSHIP, WESTRIDGE CAPITAL MANAGEMENT, INC., PAUL GREENWOOD,
STEPHEN WALSH,

*Defendants,*

ROBIN GREENWOOD,

*Relief Defendant,*

JANET WALSH,

*Relief Defendant-Appellant.*

_____

B e f o r e:

RAGGI, LYNCH and WALLACE, *Circuit Judges.**

_____

_____Appeals from a memorandum decision and orders of the United States District Court for the Southern District of New York (George B. Daniels, *Judge*) granting preliminary injunctions freezing certain assets of relief defendant Janet Schaberg.

Questions certified.

_____

STEVEN L. KESSLER (Eric M. Wagner, *on the brief*), Law Offices of Steven L. Kessler, New York, NY, *for Relief Defendant-Appellant Janet Walsh.*

_____

* The Honorable J. Clifford Wallace, United States Court of Appeals for the Ninth Circuit, sitting by designation.

2

NANCY R. DOYLE, Assistant General Counsel (Bradford M. Berry, Deputy General Counsel, *on the brief*), *for* Dan M. Berkovitz, General Counsel, Commodity Futures Trading Commission, Washington, D.C., *for Plaintiff-Appellee Commodity Futures Trading Commission*.

ALLAN A. CAPUTE (Mark D. Cahn, Deputy General Counsel, and Jacob H. Stillman, Solicitor, *on the brief*), *for* David M. Becker, General Counsel, Securities and Exchange Commission, Washington, D.C., *for Plaintiff-Appellee Securities and Exchange Commission*.

--------

GERARD E. LYNCH, *Circuit Judge*:

Relief defendant-appellant Janet Schaberg, sued under the name Janet Walsh, is the former wife of Stephen Walsh, a defendant in actions brought by plaintiffs-appellees the Commodity Futures Trading Commission (the "CFTC") and the Securities and Exchange Commission (the "SEC") (together, the "agencies") alleging violations of the anti-fraud provisions of the Commodity Exchange Act and the Securities Exchange Act. The agencies claim that, among other violations of securities law between 1996 and 2009, Walsh and his co-defendant Paul Greenwood misappropriated from funds they managed for various investors as much as 554 million dollars. The agencies seek disgorgement of this money. Although the agencies allege no wrongdoing by Schaberg, they seek disgorgement of whatever proceeds from the fraudulent scheme are in her possession.

The district court (George B. Daniels, *Judge*) entered *ex parte* restraining orders freezing the bulk of Schaberg's assets. Subsequently, by decision and order, the district court converted the restraining orders to preliminary injunctions, prohibiting Schaberg

3

from transferring, disposing of or otherwise encumbering essentially any of her assets without the approval of the court.

In these appeals, Schaberg argues that the district court abused its discretion in issuing the injunctions, since, she contends, the frozen property is not subject to disgorgement in the proceedings against her husband. In opposition, the SEC and CFTC not only contest Schaberg's arguments but also contend that we lack jurisdiction to hear these appeals.

We conclude that we have jurisdiction to hear these appeals. We further conclude, however, that determining whether Schaberg's assets are properly subject to a freeze by the district court in these proceedings requires us to assess whether Schaberg has a legitimate claim under New York law to the property she acquired in her separation from Stephen Walsh. Since this inquiry addresses unsettled and significant issues of state law, we certify, pursuant to 22 N.Y.C.R.R. § 500.27(a) and 2d Cir. R. 27.2, two questions to the New York Court of Appeals.

**BACKGROUND**

Janet Schaberg was married to Stephen Walsh from 1982 until 2004. Over this period, Walsh was either a substantial shareholder in or a management partner of a number of business enterprises, including Champion Sportswear, Tanger Malls and the New York Islanders hockey team. As a couple, the Walshes also purchased, and sometimes sold, a number of real estate properties, including condominiums in Florida

4

and New York City, and houses in Port Washington, New York. During the marriage, Schaberg's only employment was as an unpaid volunteer for a series of charitable organizations.

Between August 2000 and February 2009, more than 18 million dollars was wired from accounts registered to Walsh and Greenwood's investment firm, WG Trading Investors, to accounts registered in Schaberg's name. This money was used to pay the Walshes' bills, including their children's college tuition and household expenses. The agencies allege that these transfers represented the fraudulent misappropriation of investor funds.

The Walshes separated in 2004 and began divorce proceedings in early 2005. Schaberg and Walsh negotiated the terms of their separation for some time, finally signing a property settlement and separation agreement on November 1, 2006. Under the terms of the agreement, Schaberg conveyed her ownership interest in a jointly held Port Washington house to Walsh, while she received sole ownership of condominiums in New York City and in Florida. The agreement also provided that Schaberg retained, and Walsh waived all claim to, nearly 5 million dollars held in several checking accounts, and that Walsh agreed to pay Schaberg a total of 12.5 million dollars, first in biannual installments of $500,000 through 2016, and then in biannual installments of $250,000 through 2020. In executing the agreement, both parties waived their rights to any distributive award or equitable distribution with respect to property acquired by the other

either before or during the marriage.

In February of 2009, the CFTC and SEC each filed multi-count complaints in the United States District Court for the Southern District of New York, alleging a large-scale fraud by Walsh, his partner Paul Greenwood, and various investment vehicles they controlled. Both complaints sought monetary penalties and other forms of injunctive relief from the named defendants, as well as the disgorgement of ill-gotten gains plus pre-judgment interest from the defendants and the relief defendants alike. The complaints named Schaberg as a relief defendant, along with other entities believed to be in possession of proceeds from the fraud, and sought disgorgement from her of the ill-gotten funds.

At the outset of the action, on February 25, 2009, the agencies moved by orders to show cause for preliminary injunctions and temporary restraining orders freezing the assets of the defendants and relief defendants and appointing a receiver. The district court immediately issued temporary restraining orders appointed a receiver in both actions, and, on March 3, 2009, held oral argument on the motions for preliminary injunctions. On May 22, 2009, the court granted both agencies' motions for preliminary injunctions freezing the assets of the primary defendants. In the SEC case, the district court converted the temporary restraining order into a preliminary injunction freezing one of Schaberg's bank accounts as a relief defendant, and ordered her to provide discovery, including deposition testimony, concerning her finances. On May 29, 2009, the district

court ordered Schaberg to provide discovery in the CFTC proceedings.

On August 4, 2009, the district court issued a decision and order, granting the CFTC's motion for a preliminary injunction with respect to Schaberg's assets. The court found that the agency had met its burden of demonstrating both that it was likely to succeed in ultimately tracing Schaberg's assets to the proceeds of the fraud and also that Schaberg lacked a legitimate claim to the property. Accordingly, the district court converted the temporary restraining order in the CFTC case into a preliminary injunction, freezing Schaberg's assets in her bank and brokerage accounts. Although the district court did not place Schaberg's assets in receivership, Schaberg was prohibited from transferring, disposing of, or otherwise encumbering any of her real property, jewelry or art without prior notice to the agencies and the receiver, and approval of the court.

On August 20, 2009, the district court issued an order detailing the preliminary injunction in the CFTC case, in accordance with the August 4 order. The district court also issued a revised preliminary injunction in the SEC case, conforming the earlier, narrower injunction in the SEC case to the broader terms of the August 4 order. On August 24, 2009, Schaberg petitioned the court for the emergency release of funds to pay her living expenses and legal fees. The district court referred this petition to the receiver for a recommendation.

Schaberg then appealed to this Court. Since these appeals were filed, some funds have been released to Schaberg and to her creditors by the district court upon the

recommendation of the receiver, although Schaberg remains without access to the vast majority of her assets.

**DISCUSSION**

I.    **Jurisdiction**

Schaberg's notices of appeal together identify four orders of the district court for which she seeks review: (1) the court's February 25, 2009, order granting a temporary restraining order in the SEC case; (2) the court's August 4, 2009, decision and order, converting the temporary restraining order into a preliminary injunction in the CFTC case; (3) the court's August 20, 2009 preliminary injunction in the CFTC case; and (4) the court's order referring Schaberg's application for release of funds to the court-appointed receiver. Schaberg asserts that this Court has jurisdiction to review these interlocutory orders under 28 U.S.C. § 1292(a)(1), which applies to "orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions."

The agencies, however, contend that this provision does not extend jurisdiction to review the orders appealed from here. The agencies assert that, despite its plain language, 28 U.S.C. § 1292(a)(1) grants appellate courts jurisdiction only over interlocutory orders that concern "serious" injunctions.[1] They rely on *Carson v. American Brands, Inc.*, 450 U.S. 79 (1981), in which, they claim, the Supreme Court held that a litigant relying on

---

[1] In its briefs, the SEC did not challenge jurisdiction over Schaberg's appeals. At oral argument, however, it joined the CFTC's jurisdictional argument.

§ 1292(a)(1) must demonstrate that the order appealed from has "serious, perhaps irreparable, consequence." *Id.* at 84 (internal quotation marks omitted). They further contend that this Court has implicitly adopted this interpretation of *Carson*. Since Schaberg is able to access her funds with the permission of the district court, and since she continues to have use of her personal property, the agencies argue, the injunctions appealed from here do not have serious – let alone irreparable – consequence, and are therefore immune from appellate review.

We are not persuaded that interlocutory orders indefinitely freezing essentially all the assets of a relief defendant lack "serious consequence" simply because they allow her access to her funds at the court's discretion. But even accepting this dubious contention *arguendo*, the agencies' claim that we lack jurisdiction over these appeals is without merit.

The agencies' argument rests on fundamental misunderstanding of the Supreme Court's decision in *Carson*, as well as of a previous decision of this Court. In *Carson*, the Supreme Court considered whether an order of a district court declining to enter a proposed consent decree was an interlocutory order appealable under § 1292(a)(1). *See id.* at 80. The Court held that, even though the district court did not explicitly refuse to grant an injunction, its decision was appealable nonetheless since "prospective relief was at the very core" of the proposed consent decree, *id.* at 84, and the district court's refusal to enter it would have "serious, perhaps irreparable, consequence," *id*. at 85. *Carson's*

9

"serious consequence" test applies only to situations where the jurisdictional grant of appellate jurisdiction under § 1292(a)(1) is extended to orders that, while not explicitly "interlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions," have the practical effect of such orders. *Carson* does not impose an additional "serious consequence" requirement for appellate jurisdiction over orders that explicitly grant, continue, modify, refuse or dissolve injunctions and thereby meet the plain terms of the statute. *See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1176 (5th Cir. 1989) ("*Carson* does not apply to orders specifically granting or denying injunctions.")

The decision of this Court on which the agencies rely is likewise inapposite. The agencies cite our statement in *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 632 n.5 (2d Cir. 1995), that "[o]ur cases have not made clear whether a showing of serious consequences is always required for an interlocutory appeal pursuant to section 1292(a)(1)." This statement in a footnote cannot be read as a holding that a showing of serious consequence is required for us to have jurisdiction to review a decision granting or denying an injunction. However, even to the degree that this bit of dicta suggests some uncertainty about the law, it must be interpreted in context. In *Frank*, we applied *Carson*'s "serious consequence" test in determining that the court's direction to a party to remove liens on a particular property was immediately appealable, even though it was not explicitly an injunction, because it had the "practical effect of granting injunctive relief." *Id.* at 632.

10

What was appealed in *Frank* was not an explicit interlocutory injunction, but rather a portion of what was denominated by the district court a "judgment." We determined that we had jurisdiction under § 1292(a)(1) only after determining that we lacked jurisdiction under 28 U.S.C. § 1291, since the judgment appealed from was not "final" as required by the latter provision. *See id.* at 631-33. The statement relied upon by the agencies, therefore, must be read as an expression of doubt concerning whether the *Carson* test must be applied in all circumstances where jurisdiction under § 1292(a)(1) is asserted over orders that are not explicit interlocutory injunctions. We were not questioning whether "serious consequences" must be shown by a party seeking to appeal an explicit interlocutory grant of injunctive relief. Accordingly, *Frank* is fully reconcilable with our conclusion that *Carson* imposes no additional "serious consequence" test for appellate jurisdiction under § 1292(a)(1) over interlocutory orders explicitly granting injunctions.[2]

We are satisfied, therefore, that we have jurisdiction over the district court's orders converting its temporary restraining order into a preliminary injunction and its further order elaborating the preliminary injunction. We proceed, therefore, to the substance of Schaberg's appeals.[3]

---

[2] In any event, to whatever extent *Frank* can be read as applicable to the present circumstances, it holds at most that the question raised by the agencies regarding the meaning of *Carson* remained open. We now decide that question, and reject the agencies' reading of *Carson*.

[3] We do not, however, possess jurisdiction over the two other orders appealed by Schaberg. The district court's issuance of a temporary restraining order, which is not an

11

## II. **The Preliminary Injunctions**

The SEC and CFTC proceed against Schaberg as a relief defendant. A relief defendant is a person who "holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998), *quoting SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991). Such a person may be joined in a securities enforcement action "to aid the recovery of relief," provided she "has no ownership interest in the property which is the subject of litigation." *SEC v. George,* 426 F.3d 786, 798 (6th Cir. 2005) (internal quotation marks omitted); *see also SEC v. Cavanagh,* 445 F.3d 105, 109 n.7 (2d Cir. 2006) ("*Cavanagh II*"); *Cherif*, 933 F.2d at 414. District courts have the power to order disgorgement from a relief defendant upon a finding that she (1) is in possession of ill-gotten funds and (2) lacks a legitimate

---

injunction, is not appealable in these circumstances. *Romer v. Green Point Sav. Bank,* 27 F.3d 12, 15 (2d Cir. 1994) ("As a [temporary restraining order] is interlocutory and is not technically an injunction, it is ordinarily not appealable.") Likewise, the district court's order referring Schaberg's request for the release of some of her funds to the court-appointed receiver is also not injunctive – either explicitly or practically – and is therefore not appealable under § 1292(a)(1); nor is it appealable under § 1292(a)(2), which pertains to receivers, but provides for appellate review only of orders "appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof." Furthermore, since the issues presented by the district court's decision to grant the temporary restraining order and to refer Schaberg's request to a receiver are not "inextricably intertwined" with the issues presented by the orders over which we have jurisdiction, *Merritt v. Shuttle, Inc.*, 187 F.3d 263, 268 (2d Cir. 1999) (internal quotation marks omitted), nor are they "necessary to ensure meaningful review" of those orders, *id*. (internal quotation marks omitted), supplementary appellate jurisdiction is not warranted. *Cf. In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 121-23 (2d Cir. 2007).

claim to those funds. *SEC v. Cavanagh,* 155 F.3d 129, 136 (2d Cir. 1998) ("*Cavanagh I*"). To obtain a preliminary injunction freezing the assets of such a relief defendant, the agencies must demonstrate only that they are likely ultimately to succeed in disgorging the frozen funds. *Id*.; *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) (holding that the SEC need not show the likelihood of a recurring violation of securities law to obtain an injunction freezing the assets of a named defendant, since such an injunction aims only to preserve the SEC's opportunity to collect funds.)

We review a grant of a preliminary injunction freezing assets for abuse of discretion. *Cavanagh I,* 155 F.3d at 132. A district court necessarily abuses its discretion if it "applies legal standards incorrectly or relies upon clearly erroneous findings of fact, or proceeds on the basis of an erroneous view of the applicable law." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 398 (2d Cir. 2004) (internal quotation marks, citations and brackets omitted).

Schaberg contends primarily that the district court erred in determining as a matter of law that she lacked a legitimate claim to the frozen funds, and therefore that an injunction was authorized under *Cavanagh I*.[4] She claims instead that she acquired her

---

[4] Schaberg also argues that the district court erred in concluding that the SEC had met the first prong of the *Cavanagh* test – that she possessed ill-gotten gains – with regards to all of her assets, since, she asserts, some of her assets were purchased with funds that are not alleged to be the proceeds of fraud, and thereby would not be subject to disgorgement. We reserve judgment on this issue, pending the response to our certification by the New York Court of Appeals. If that court concludes that Schaberg has a legitimate claim to all the frozen assets, we need not reach the issue of whether the

13

assets pursuant to the separation agreement she executed with Walsh in their divorce proceedings, and that by executing this agreement she became a good faith purchaser for value of the assets. Therefore, she asserts, she has a "legitimate claim" and her assets are not subject to disgorgement in the action against her ex-husband.

We agree with Schaberg that if she received her assets only when they were transferred to her pursuant to the separation agreement and if she is a good faith purchaser for value, then her assets are immune from disgorgement. District courts may only require disgorgement of the assets of a relief defendant upon a finding that she lacks a "legitimate claim." *See Cavanagh I,* 155 F.3d at 136; *accord Janvey v. Adams*, 588 F.3d 831, 834 & 835 n.2 (5th Cir. 2009); *SEC v. Ross*, 504 F.3d 1130, 1144 (9th Cir. 2007); *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191-92 (4th Cir. 2002); *Cherif*, 933 F.2d at 414 n.11. While we have not developed explicit guidelines for what qualifies as a "legitimate claim," we have held that the receipt of property as a gift, without the payment of consideration, does not create a "legitimate claim" sufficient to immunize the property from disgorgement. *See Cavanagh I*, 155 F.3d at 137; *see also George*, 426

---

district court abused its discretion in the scope of its injunction. We note, however, that whether the frozen funds can be traced to the proceeds of the alleged fraudulent scheme is not necessarily dispositive. *See SEC v. Byers*, No. 08 Civ. 7104 (DC), 2009 WL 33434, at *3 (S.D.N.Y. Jan. 7, 2009) (Chin, *J*.) (concluding that "a freeze order need not be limited only to funds that can be directly traced to . . . illegal activity" since defendants should not benefit from commingling their ill-gotten gains with other assets) (internal quotation marks omitted); *see also Cavanagh II,* 445 F.3d at 116-17 (emphasizing the breadth of the district court's discretion in ordering equitable disgorgement).

14

F.3d at 798 (holding that a relief defendant must disgorge a diamond ring given to her as a gift because the money used to buy it was obtained through fraud).  While we have not directly addressed the issue, our sister courts of appeal have held that relief defendants who have provided some form of valuable consideration in good faith in return for proceeds of fraud are beyond the reach of the district court's disgorgement remedy.  *See Janvey,* 588 F.3d at 834-35 (holding that creditors whose loans were repaid by defendant in SEC enforcement action had sufficient legitimate ownership of the funds so as to preclude being treated as relief defendants);[5] *Kimberlynn Creek Ranch*, 276 F.3d at 192 ("[R]eceipt of funds as payment for services rendered to an employer constitutes one type of ownership interest that would preclude proceeding against the holder of the funds as a [relief] defendant.").  On this basis, we conclude that if Schaberg truly is a good faith purchaser for value of the assets in her possession – a question of New York state law, *see Butner v. United States,* 440 U.S. 48, 55 (1979) (As a general rule, "[p]roperty interests are created and defined by state law.") – her assets would not be subject to disgorgement in a proceeding against her former husband.

Schaberg's argument that she holds her assets as a good faith purchaser for value proceeds in two steps: first, she argues that the district court erred in focusing its analysis

---

[5] We find the reasoning in *Janvey* more persuasive than the holding of our unpublished, non-precedential summary order, *SEC v. Andrescu*, 117 Fed. App'x 160 (2d Cir. 2004) (unpublished summary order), a *pro se* case that reached the opposite conclusion without any apparent reasoning.

on transfers of investor funds to her checking accounts over the course of her marriage. These transfers, she contends, were not to her, but rather to her and Walsh together, and the money, even after the transfers, was not her individual property, but rather part of the marital estate. Schaberg asserts that this money was transferred to *her* only by the separation agreement she executed with Walsh. Second, Schaberg contends that because she relinquished valuable claims to the Walsh marital estate in this negotiated and arms-length separation agreement, she holds whatever she derived from the agreement as a good faith purchaser for value. Evaluating Schaberg's argument involves addressing two substantial questions of New York state law.

A.    New York Domestic Relations Law § 236

The first prong of Schaberg's argument is that the district court erred in concluding that she received money separately while she was married, since this money was jointly held "marital property." As she notes, New York Domestic Relations Law ("DRL") § 236 defines "marital property" as "all property acquired by either or both spouses during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action, regardless of the form in which title is held." *See Musso v. Ostashko*, 468 F.3d 99, 105 (2d Cir. 2006) (explaining that, since marriage is an economic partnership, New York law provides that all its proceeds should be divided equitably upon dissolution). Although the money was held in an account in her name, she maintains, it was held – and used – for the benefit of the marital estate, to pay expenses that were not

16

hers alone, but of the marital unit. Accordingly, she asserts that it was only when pursuant to the execution of a separation agreement with Walsh in 2006 she was permitted to retain the remaining funds in her checking accounts, that the funds were transferred from the marital estate, a transfer which could serve to give rise to a "legitimate claim."[6]

In opposition, the agencies contend that the monies misdirected from investor accounts to Schaberg's checking accounts never became marital property, and accordingly could not be transferred from the marital estate to Schaberg by means of the separation agreement. They argue that DRL § 236 implicitly extends the marital estate only to property obtained lawfully. If the proceeds of the fraud never became part of the marital estate, Schaberg could not have acquired them in her separation agreement, and her only claim to ownership would be based on receipt of the funds while she was married. Under *Cavanagh I*, this receipt of the funds without consideration would be insufficient to defeat the agencies' disgorgement claim.

We agree with Schaberg that a separation agreement can serve as a conveyance from the marital estate to divorcing individuals within the meaning of New York Real Property Law § 290(3), which defines "conveyance" to include "every written instrument, by which any estate or interest in real property is created." *See FDIC v. Malin,* 802 F.2d

_____

[6] For similar reasons, she contends that the agencies err in asserting that tens of millions of dollars were transferred to her during the pendency of the marriage (and the fraud), and that the only money that ever came to her (as a good faith purchaser or otherwise) was the money that became hers pursuant to the settlement agreement.

17

12, 17 (2d Cir. 1986). Accordingly, if the funds at issue were part of the marital estate, her agreement with Walsh did create an interest in the funds for her individually. *See id.*

We are unable to determine, however, whether DRL § 236 defines "marital property" to include the proceeds of fraud. On the one hand, the plain language of the statute suggests that "marital property" should include such assets; Section 236(B)(1)(c) defines marital property as "all property acquired by either or both spouses during the marriage and before . . . the commencement of a matrimonial action, regardless of the form in which title is held." No New York authority supports the agencies' contention that the word "acquired" implicitly includes a requirement of lawfulness. Furthermore, New York courts are clear that the term "marital property" is to be broadly construed, *see Price v. Price,* 503 N.E.2d 684, 687 (N.Y. 1986), and that the law favors the inclusion of property within the marital estate, *see Burns v. Burns*, 643 N.E.2d 80, 82 (N.Y. 1994).[7]

On the other hand, a lower court decision in New York suggests that the New York Court of Appeals might not extend § 236's definition of marital property to include any assets misappropriated from investor funds over the course of the Walshes' marriage. In a divorce proceeding between a couple that jointly operated an unlawful loansharking enterprise, a New York Supreme Court held that the proceeds of an illegal business are not

---

[7] Moreover, there is some authority that under New York law a culpable party to a voidable transaction "acquires title, albeit voidable title, to the property he has received . . . [and] may convey good title to a good-faith purchaser." *SEC v. Levine*, 881 F.2d 1165, 1176 (2d Cir. 1989).

18

marital property. *LaPaglia v. LaPaglia*, 514 N.Y.S.2d 317, 318 (Sup. Ct. Kings Cnty. 1987). The court reasoned that, as a matter of public policy, the "fruits of a criminal enterprise" are not subject to equitable distribution. *Id.*

Furthermore, we believe that since New York has no binding authority on this question, the New York Court of Appeals may be swayed by persuasive authority from other states. The Supreme Court of Colorado has held that the marital estate does not include proceeds of fraud. *See In re Marriage of Allen*, 724 P.2d 651 (Colo. 1986). In *Allen*, an employer sued its employee to recover embezzled funds and then sued the exployee's ex-wife to recover that portion of the embezzled funds that she received pursuant to a property settlement agreement executed in their divorce. The ex-wife argued that she was entitled to keep the assets of the fraud, because she was a good faith purchaser for value by virtue of the settlement agreement. The court, however, rejected this argument, finding that "[t]he property was never truly a marital asset and should never have been subject to the Allens' property division negotiations." *Id.* at 659. The court concluded that there was "no reason to enhance a spouse's interest in misappropriated property" merely because the marriage is later dissolved. *Id.* Similarly, a New Jersey court has held that illegally obtained funds were not properly subject to equitable division. *See Sheridan v. Sheridan*, 589 A.2d 1067, 1071 (N.J. Super. Ct. Ch. Div. 1990).

Since the New York Court of Appeals has not been presented with a case similar to *Allen*, we are uncertain how it would address the issue of whether the proceeds of fraud

19

can be considered marital property. Accordingly, we certify this question to that Court:

*Does "marital property" within the meaning of New York Domestic Relations Law § 236*

*include the proceeds of fraud?*

        B.     <u>New York Debtor and Creditor Law §§ 278 and 272</u>

Even if Schaberg's separation agreement served to transfer the marital assets to her individual ownership, our analysis still requires a second step: we must determine whether this transfer made Schaberg a good faith purchaser for value according to the terms of New York Debtor and Creditor Law ("DCL") § 278. This inquiry also presents a substantial issue of New York state law, and thus we certify a second question to the New York Court of Appeals.

DCL § 278 provides that a creditor whose claim has matured may have a conveyance set aside "against any person," other than a good faith purchaser for value, defined as "a purchaser for fair consideration without knowledge of the fraud." Schaberg contends that she meets this definition because the assets were transferred to her without notice of their source, and she paid "fair consideration," which is defined by DCL § 272 as given when "in exchange for . . . property, . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied." Schaberg argues that she paid "fair consideration" because, in return for the receipt of her property in the agreement, she agreed that she would "never . . . seek through court proceedings or otherwise a distributive award or an award of equitable distribution with respect to" any

20

other property acquired by her husband over the course of their marriage.[8]

Schaberg relies upon *FDIC v. Malin*, 802 F.2d 12 (2d Cir. 1986). In *Malin*, we held that a judgment creditor could not set aside as fraudulent under DCL § 278 a conveyance of a house from a husband, Leonard Malin, to his wife, Phyllis Malin, in a separation agreement. We determined that Phyllis's interest in the house was protected, since it was transferred to her before the date of the creditor's judgment lien, she had no notice of the fraud, and she paid fair consideration for the property according to the terms of DCL § 272. *Id.* at 18-19. Our determination that Phyllis paid fair consideration turned on the findings that the separation agreement represented a "bargained for" exchange in which the wife relinquished "rights and remedies otherwise conferred by law," thereby freeing her husband from his antecedent obligation to provide maintenance and child support. *Id.* at 19-20. Schaberg contends that her relinquishment of any further claims on the marital estate in the bargained-for exchange effected by her separation agreement is indistinguishable from Phyllis Malin's, and thus that *Malin* provides binding precedent holding that she is a good faith purchaser for value of the assets she possesses pursuant to the separation agreement.

---

[8] Although the agencies now claim otherwise, it is essentially undisputed that Schaberg had no notice that the money she received in her divorce was derived from fraud. The district court did not address this issue, since it determined that it could freeze Schaberg's assets regardless of whether she had notice of their source. However, none of the evidence pointed to by the agencies in their briefs support their assertions that Schaberg knew the true source of her assets.

21

Schaberg is wrong, however, in her assertion that it is impossible to distinguish her relinquishment of claims to future distributions of her marital property from the valuable consideration paid by Phyllis Malin. In *Malin*, it was the *transfer* of property from Leonard to Phyllis that the plaintiff sought to rescind as fraudulent, since, it was contended, that transfer was effected so that the house would not be subject to a claim by the FDIC as a creditor. No party in *Malin* contended that the house itself represented the proceeds of fraud. Rather, in that case, both the property that was transferred and the property to which Phyllis Malin relinquished her future claims was property in which the couple indisputably already had a legitimate interest. By contrast, in her separation from Walsh, Schaberg relinquished future claims to an equitable distribution of marital property that – it is alleged – consisted almost entirely of the proceeds of fraud. Schaberg did not have a legitimate claim to the property while she was married to Walsh, and the issue in contention is whether the transfer to her individually served to create a legitimate interest where none existed before.

We are uncertain whether, under DCL § 272, a spouse pays fair consideration by relinquishing in good faith claims to funds in which she in fact has no legitimate interest. On the one hand, New York law holds that the focus of the good faith inquiry is on the subjective intent of the transferee. *In re Sharp Int'l Corp.*, 403 F.3d 43, 54 n.4 (2d Cir. 2005); *see also Morse v. Howard Park Corp.*, 272 N.Y.S.2d 16, 22-26 (Sup. Ct. Queens Cnty. 1966). Since there is no reason to question Schaberg's good faith in relinquishing

22

her claim to what she believed was a legitimate interest in a substantial fortune, this inquiry strengthens Schaberg's argument that she is a good faith purchaser for value under DCL § 272.

On the other hand, DCL § 272 requires that in order to attain the status of good faith purchaser for value the transferee must confer to the transferor "a fair equivalent," a term that implies that the transferee must convey property in which she has a legitimate interest. A New York court has held that a "fair equivalent" is not given when a wife relinquishes a claim to maintenance and child support of only minimal economic value. *Century Ctr., Ltd. v. Davis*, 473 N.Y.S.2d 492, 493-94 (2d Dep't 1984). We have similarly held that the surrender of contingent future claims fails to satisfy the statute's requirement that the transferee confer a "fair equivalent." *HBE Leasing Corp v. Frank*, 61 F.3d 1054, 1059-60 (2d Cir. 1995) (holding that the relinquishment of future claims to marital property in a prenuptial agreement is insufficient to serve as fair consideration under DCL § 272, since before the marriage one spouse has only a contingent right to support from the other). Both of these instances are analogous to the case at bar, but in neither case are the situations similar enough to provide us with a rule of decision. We have discovered no New York authority that addresses whether a "fair equivalent" is paid when a transferee in good faith relinquishes claims to property of substantial value, but these claims are later determined to be illegitimate.

Accordingly, we certify a second question to the New York Court of Appeals: *Does*

23

*a spouse pay "fair consideration" according to the terms of New York Debtor and Creditor Law § 272 when she relinquishes in good faith a claim to the proceeds of fraud?*

III.    **Certification**

New York law permits us to certify to New York's highest court "determinative questions of New York law [that] are involved in a case pending before [us] for which no controlling precedent of the Court of Appeals exists." 22 N.Y.C.R.R. § 500.27(a); *see also* 2d Cir. R. 27.2(a) ("If state law permits, the court may certify a question of state law to that state's highest court.").  Nonetheless, we do not certify all novel questions of state law.  Rather, "[w]e resort to certification sparingly, mindful that it is our job to predict how the New York Court of Appeals would decide the issues before us." *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 388 (2d Cir. 2009).

We conclude that certification is appropriate in these appeals in light of several factors.  First, we have recognized that certification is often appropriate if the issue before us is one that the New York Court of Appeals has not had the opportunity to address. *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 42 (2d Cir. 2010).  In this case, the New York Court of Appeals has not addressed the relationship between the provisions of the Debtor and Creditor Law on which Schaberg relies and the definition of marital property in § 236 of New York's Domestic Relations Law.  Nor have issues similar to those raised here been litigated in New York courts often enough that "sufficient precedents exist for use to make [a] determination" concerning their proper outcome.

24

*Tinelli v. Redl*, 199 F.3d 603, 606 n.5 (2d Cir. 1999) (alteration in original). Accordingly, this factor weighs strongly in favor of certification.

Second, we have held it appropriate to certify questions where the plain language of the statutes involved does not indicate the answer. *Am. Buddha*, 609 F.3d at 42. Here, for the reasons discussed, we find the language of the statutes on which Schaberg relies to be inconclusive. Third, we have said it may be particularly appropriate to certify questions that involve value judgments and important public policy choices, since the New York Court of Appeals is better situated than we to make these decisions. *See Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 229 (2d Cir. 2006). These appeals require us to decide, among other issues, whether as a matter of public policy, New York's definition of "marital property" should be held to include the proceeds of fraud. We believe that the New York Court of Appeals is better situated than we are to decide this issue given its greater familiarity with New York matrimonial litigation and the likely importance of the issue to New York domestic relations law. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 13 (2004) ("[I]n general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts.").

Lastly, we have said that certification may be appropriate if the question certified will control the outcome of the case. *Am. Buddha*, 609 F.3d at 42. While answers to the questions we certify here will either entirely resolve these appeals or aid immensely in their resolution, the response of the Court of Appeals is unlikely to bring the litigation out of which these appeals arise to a close. Nonetheless, the resolution of the status of

25

Schaberg's claim to her assets may end her involvement in the litigation against her husband, an interest that we find also weighs in favor of certification.

**CONCLUSION**

For the reasons stated, the court hereby certifies the following questions to the New York Court of Appeals:

(1)　Does "marital property" within the meaning of New York Domestic Relations Law § 236 include the proceeds of fraud?

(2)　Does a spouse pay "fair consideration" according to the terms of New York Debtor and Creditor Law § 272 when she relinquishes in good faith a claim to the proceeds of fraud?

The Court of Appeals may answer these questions in whatever order it deems best to assist this court in determining whether Janet Schaberg has a legitimate claim to the money she acquired in her separation from Stephen Walsh. Similarly, the Court of Appeals may reformulate these questions as it sees fit, or expand them to address any other issues of New York law pertinent to these appeals.

This panel retains jurisdiction for purposes of resolving these appeals once the New York Court of Appeals has responded to our certification.

It is, therefore, ORDERED that the Clerk of this Court transmit to the Clerk of the New York Court of Appeals this opinion as our certificate, together with a complete set of briefs, appendices, and the record filed in this case by the parties.