19-2266-cv
*Brooklyn Center for Psychotherapy, Inc. v. Philadelphia Indemnity Insurance Co.*

# United States Court of Appeals
# for the Second Circuit

August Term, 2019

(Argued: February 6, 2020          Decided: April 9, 2020)

Docket No. 19-2266-cv

————————————————————

BROOKLYN CENTER FOR PSYCHOTHERAPY, INC.,

*Plaintiff-Appellant*,

v.

PHILADELPHIA INDEMNITY INSURANCE COMPANY,

*Defendant-Appellee.*

————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

————————————————————

Before:

POOLER, LYNCH, and PARK, *Circuit Judges*.

Plaintiff-Appellant Brooklyn Center for Psychotherapy, Inc. appeals a decision and order of the United States District Court for the Eastern District of New York (Donnelly, *J.*) dismissing its claim against Philadelphia Indemnity Insurance Company for breach of contract for failing to provide a defense in a lawsuit alleging discrimination under a failure-to-accommodate theory. Because

this case turns on an open question of New York insurance law, we reserve decision and certify a question to the New York Court of Appeals.

MICHAEL Y. HAWRYLCHAK, O'Connell & Aronowitz, P.C., Albany, New York (Jeffrey J. Sherrin, *on the brief*), *for Plaintiff-Appellant*.

DAN D. KOHANE, Hurwitz & Fine, P.C., Buffalo, New York, *for Defendant-Appellee*.

Park, *Circuit Judge*:

This case involves a dispute over the scope of a commercial general liability insurance policy. A deaf woman sued the insured, Brooklyn Center for Psychotherapy, Inc. ("Brooklyn Center"), for failing to accommodate her disability. Brooklyn Center sought defense costs for that lawsuit from its insurer, Philadelphia Indemnity Insurance Company ("PIIC"). PIIC refused, so Brooklyn Center sued PIIC. The district court granted PIIC's motion to dismiss because New York law prohibits insurance coverage for intentional discrimination. The New York Court of Appeals, however, has not yet addressed whether a general liability insurance carrier must defend an insured in an action alleging discrimination under a failure-to-accommodate theory. We thus reserve decision and certify the question to the New York Court of Appeals.

2

# I. BACKGROUND

## A.     The Underlying Action

Fanni Goldman, who is deaf, sued Brooklyn Center for allegedly discriminating against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*; the Rehabilitation Act, 29 U.S.C. § 794; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin Code § 8-101 *et seq*. *See Goldman v. Brooklyn Center for Psychotherapy, Inc.*, No. 15-cv-2572 (E.D.N.Y) (the "Underlying Action").

In her complaint, Goldman alleged the following:

- Brooklyn Center "refused to schedule an appointment" for her seven-year-old son because of her disability.  App'x at 23.

- A Brooklyn Center employee told her on two occasions that they "would not provide interpreter services and that [she] should look elsewhere" for her son's psychiatric treatment.  *Id*. at 24.

- Brooklyn Center "refuses to hire qualified onsite sign language interpreters as a matter of policy and practice."  *Id*.

- Brooklyn Center's refusal to provide interpreter services constituted "intentional[] discriminat[ion]" and "deliberate indifference to her communication needs."  *Id*. at 25.

- Brooklyn Center's conduct "caus[ed] her to endure humiliation, fear, anxiety, and emotional distress."  *Id*.

After trial, a jury found for Brooklyn Center, concluding that Goldman had failed to prove unlawful discrimination.

B.      The Coverage Dispute

During the relevant time period, Brooklyn Center held a commercial general liability insurance policy with PIIC (the "Policy"). The Policy provided coverage for "those sums that [Brooklyn Center] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' . . . caused by an 'occurrence.'" App'x at 37. Under the Policy, PIIC also had a "duty to defend [Brooklyn Center] against any 'suit' seeking those damages." *Id*. The Policy defines an "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." App'x at 39.

After Goldman filed the Underlying Action, Brooklyn Center notified PIIC of the litigation and asked PIIC to pay for its defense costs under the Policy. PIIC rejected Brooklyn Center's request for coverage on the ground that Goldman's complaint did not allege any "occurrence" under the Policy.[1]

---

[1] PIIC originally argued that Goldman's complaint did not allege any "bodily injury" or "property damage" under the Policy. But PIIC abandoned that position because, under New York law, emotional distress can qualify as a bodily injury under the terms of the Policy. *See Lavanant v. Gen. Acc. Ins. Co. of Am.*, 79 N.Y.2d 623, 631 (1992).

4

## C.      Procedural History

Brooklyn Center filed suit against PIIC in state court alleging, *inter alia*, that PIIC had breached the Policy by refusing to cover Brooklyn Center's defense costs for the Underlying Action.  PIIC removed the case to the U.S. District Court for the Eastern District of New York on diversity jurisdiction grounds and then moved to dismiss Brooklyn Center's complaint for failure to state a claim.  The district court granted PIIC's motion, holding that the Policy did not require PIIC to cover Brooklyn Center's defense costs because Goldman's complaint "alleged only intentional acts resulting in discrimination," and "[i]ntentional discriminatory acts are not accidental and thus not [occurrences] covered by the [P]olicy."  App'x at 481, 477.

# II.  APPLICABLE LAW

## A.    Standard of Review

"We review *de novo* the grant of a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6)."  *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).  "We consider the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor."  *Id*.

B.     Duty to Defend

"In New York, an insurer's duty to defend is exceedingly broad," *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014) (internal quotation marks omitted), and "an insurer will be called upon to provide a defense whenever the allegations of the complaint suggest a reasonable possibility of coverage," *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006) (cleaned up). "Thus, an insurer may be required to defend under the contract even though it may not be required to pay once the litigation has run its course." *Id*. "Whether a complaint asserts additional claims falling outside the policy is immaterial," and "[a]ny doubt as to whether the allegations state a claim within the coverage of the policy must be resolved in favor of the insured and against the carrier." *Euchner-USA, Inc.*, 754 F.3d at 141 (internal quotation marks omitted). "Put another way, [a] defendant has no obligation to defend only if it can be concluded as a matter of law that there is no possible factual or legal basis on which [the] defendant might eventually be held to be obligated to indemnify plaintiff under any provision of the insurance policies." *Mary & Alice Ford Nursing Home Co. v. Fireman's Ins. Co. of Newark, N.J.*, 446 N.Y.S.2d 599, 600 (N.Y. App. Div. 1982), *aff'd* 57 N.Y.2d 656 (1982).

## C.    An "Occurrence"

On appeal, the parties dispute whether any of Brooklyn Center's actions alleged in Goldman's complaint is an "occurrence"—defined as "an accident"—under the Policy. App'x at 39. The provision at issue is a standard one that "has commonly appeared in comprehensive general liability policies since 1966." *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1149 (discussing identical insurance policy language). We have thus had occasion to opine on the meaning of "occurrence" and "accident" under New York law.

In *City of Johnstown*, we explained that, "[i]n attempting to define what events are 'accidental,' the New York courts have focused on the nexus between an intentional act and the resulting damage." 877 F.2d at 1150. "Recovery will be barred only if the insured intended the damages, or if it can be said that the damages were, in a broader sense, 'intended' by the insured because the insured knew that the damages would flow directly and immediately from its intentional act." *Id*. (internal citations omitted) (citing *McGroarty v. Great Am. Ins. Co.*, 36 N.Y.2d 358, 363–65 (1975), and *Mary & Alice Ford Nursing Home Co.*, 446 N.Y.S.2d at 601). "In those instances, coverage is precluded because the damages are not 'accidental.'" *City of Johnstown*, 877 F.2d at 1151.

In other words, under New York law, damages that are not intended by an insured are considered "accidental," and an act causing such unintended damages is considered an "occurrence."[2] That does not mean, however, that coverage is barred any time an insured performs an intentional act that ultimately causes damage. Rather, a "distinction is drawn between damages which flow directly and immediately from an intended act, thereby precluding coverage, and damages which accidentally arise out of a chain of unintended though expected or foreseeable events that occurred after an intentional act." *Id*. at 1150 (internal quotation marks omitted). "Thus, though an *intentional* act may ultimately cause certain damages, those damages may, under New York law, be considered 'accidental' if the total situation could be found to constitute an accident." *Id*. (emphasis in original, internal quotation marks omitted); *see also Graphic Arts Mut. Ins. Co. v. Pine Bush Cent. Sch. Dist*., 73 N.Y.S.3d 241, 245 (N.Y. App. Div. 2018) ("An act that is intentionally committed or performed may still be considered an accident within the meaning of an insurance policy, as long as the insured did not expect or intend the harm caused.").

---

[2] The Policy language thus allows coverage to the extent allowed by New York public policy. *See*, *e.g.*, *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 21 N.Y.3d 324, 335 (2013) ("[A]s a matter of public policy, an insured may not seek coverage when it engages in conduct with the intent to cause injury.") (internal quotation marks omitted).

D.     Discrimination Claims

Brooklyn Center argues that PIIC was obligated to defend it under the Policy because, in the Underlying Action, Goldman alleged—in addition to any intentional discrimination claims—that Brooklyn Center discriminated against her by failing to accommodate her hearing disability.  PIIC, on the other hand, contends that Brooklyn Center's refusal to accommodate Goldman's disability was intentional, so Goldman's failure-to-accommodate claims cannot constitute occurrences under the Policy.

A plaintiff alleging disability discrimination "can base [her] claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (internal quotation marks omitted).

"Disparate treatment is the most easily understood type of discrimination. The [defendant] simply treats some people less favorably than others because of their race, color, religion or other protected characteristics. Proof of discriminatory motive is critical." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993) (cleaned up).

"Claims that stress disparate impact by contrast involve . . . practices that are facially neutral in their treatment of different groups but that in fact fall more

harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive is not required under a disparate-impact theory." *Id.* (cleaned up).

Finally, failure-to-accommodate claims involve allegations that "a disability makes it difficult for a plaintiff to access benefits" "to which [she is] legally entitled." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 277, 273 (2d Cir. 2003). Importantly, the ADA, the Rehabilitation Act, and the NYSHRL all require defendants to afford only "*reasonable* accommodation" of a plaintiff's "known disability." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (emphasis added); *see also Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004). Thus, a defendant need not make an accommodation "that imposes an undue hardship on its program's operations," and its refusal to make an unreasonable accommodation does not constitute unlawful discrimination. *Powell*, 364 F.3d at 88. "The reasonableness of an . . . accommodation is a 'fact-specific' question that often must be resolved by a factfinder." *Noll*, 787 F.3d at 94. As with disparate-impact claims, failure-to-accommodate claims do not require proof of discriminatory intent. *See Austin v. Town of Farmington*, 826 F.3d 622, 629 (2d Cir. 2016).

**III. DISCUSSION**

This case presents the question whether Brooklyn Center's alleged failure to accommodate Goldman's disability can constitute an occurrence under the Policy.

As an initial matter, New York courts have clearly held that the "occurrence" language in the Policy does not require insurers to defend suits alleging solely disparate-treatment discrimination. *See, e.g., Mary & Alice Ford Nursing Home Co.*, 446 N.Y.S.2d at 601 ("[T]he damages alleged in the . . . complaint are the intended result which flows directly and immediately from plaintiff's intentional [discriminatory] act [of firing the plaintiff because of her disability], rather than arising out of a chain of unintended though foreseeable events that occurred after the intentional act."); *see also Rosenberg Diamond Dev. Corp. v. Employers Ins. Co. of Wausau*, 144 F. App'x 122, 124 (2d Cir. 2005) ("[T]he . . . complaint alleged only intentional racial discrimination. And, under New York law, it is clear that the type of language included in the [Policy] does not extend to such intentional discriminatory acts."). Similarly, the New York Superintendent

of Insurance (the "Superintendent")[3] has explained that "discrimination based upon disparate treatment is an intentional wrong whose resultant harm flows directly from the acts committed, and liability coverage for it is impermissible" as a matter of New York public policy. N.Y. Circular Letter No. 1994-6, 1994 WL 16306026 (May 31, 1994).

On the other hand, at least one New York court has held that the Policy language does require—and New York public policy allows—an insurer to defend an insured against a *disparate-impact* discrimination suit. *See Am. Mgmt. Ass'n*, 168 Misc. 2d at 979. And the Superintendent has explained that in disparate-impact cases, "the discriminatory result does not directly proceed from specific discriminatory acts against individuals; in fact, such acts are not an element of the wrong and need play no part in the facts alleged." N.Y. Circular Letter No. 1994-6; *see also* N.Y. Ins. Op. (Dec. 20, 2005), https://www.dfs.ny.gov/insurance/ogco2005/rg051216.htm (last visited Mar. 26, 2020) ("[T]he Department has consistently disallowed intentional discrimination (disparate treatment) claims to

---

[3] The opinions of the Superintendent "with respect to the Insurance Law are to be accorded great weight by the courts unless contrary to the clear wording of a particular statute." *Am. Mgmt. Ass'n v. Atl. Mut. Ins. Co.*, 168 Misc. 2d 971, 978 (Sup. Ct.), *aff'd* 651 N.Y.S.2d 301 (App. Div. 1996). In 2011, the duties of the Superintendent were transferred to the Superintendent of Financial Services. *See* N.Y. Fin. Servs. Law §§ 102, 202.

be covered under liability insurance policies. The Department does, however, permit coverage to be provided for claims arising from unintentional discrimination: disparate impact claims and employer's vicarious liability.").

Neither New York courts nor the Superintendent, however, have provided guidance on failure-to-accommodate claims. Here, Brooklyn Center argues that failure-to-accommodate claims are more like disparate-impact claims than disparate-treatment claims because plaintiffs need not prove discriminatory intent to succeed on failure-to-accommodate claims. Indeed, the decision to refuse a particular accommodation may be justified, and will not provide a basis for liability, if the requested accommodation is unreasonable or "would impose an undue hardship on the operation of the business." *Felix v. New York City Transit Auth.*, 324 F.3d 102, 104 (2d Cir. 2003) (quoting 42 U.S.C. § 12112(b)(5)(A)); *see also Goord*, 591 F.3d at 44 ("'Reasonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires a fact-specific, case-by-case inquiry, not only into the benefits of the accommodation but into its costs as well.") (cleaned up). Thus, as long as Brooklyn Center believed that hiring interpreters to accommodate Goldman's hearing disability would have been unreasonable or

13

would have imposed an undue hardship on its business, any cognizable harm resulting from its refusal to do so would have been accidental. This position finds support in New York case law. *See*, *e.g.*, *Graphic Arts Mut. Ins. Co.*, 73 N.Y.S.3d at 245 ("An act that is intentionally committed or performed may still be considered an accident within the meaning of an insurance policy, as long as the insured did not expect or intend the harm caused.").

In response, PIIC focuses on Brooklyn Center's refusal to accommodate Goldman's disability, irrespective of its reasons for doing so. Brooklyn Center's refusal to hire interpreters, PIIC argues, was an intentional act that "directly and immediately" caused damage to Goldman. *Mary & Alice Ford Nursing Home Co.*, 446 N.Y.S.2d at 601. This position also finds support in New York case law. *See*, *e.g.*, *Cont'l Ins. Co. v. Colangione*, 484 N.Y.S.2d 929, 930 (N.Y. App. Div. 1985) ("This court . . . has distinguished between damages which flow directly and immediately from an intended act, thereby precluding coverage, and damages which accidentally arise out of a chain of unintended though expected or foreseeable events that occurred after an intentional act."). Thus, it is not clear under New York law whether a failure to accommodate a disability can be an "occurrence" for purposes of coverage under the Policy.

# IV. CERTIFICATION

"Although the parties did not request certification, we are empowered to seek certification *nostra sponte*." *Kuhne v. Cohen & Slamowitz, LLP*, 579 F.3d 189, 198 (2d Cir. 2009). "We have long recognized the appropriateness of according to state courts the opportunity to decide significant issues of state law through the certification process." *Corsair Special Situations Fund, L.P. v. Pesiri*, 863 F.3d 176, 183 (2d Cir. 2017); *see also* 22 N.Y.C.R.R. § 500.27(a).

> Our decision to certify questions to the Court of Appeals is discretionary, and when exercising that discretion we consider whether: (1) the New York Court of Appeals has not squarely addressed an issue and other decisions by New York courts are insufficient to predict how the Court of Appeals would resolve it; (2) the statute's [or, in this case, the standard "occurrence" provision's] plain language does not indicate the answer; (3) a decision on the merits requires value judgments and important public policy choices that the New York Court of Appeals is better situated than we to make; and (4) the questions certified will control the outcome of the case.

*CIT Bank N.A. v. Schiffman*, 948 F.3d 529, 537 (2d Cir. 2020) (internal quotation marks omitted). All four factors weigh in favor of certification here.

First, as discussed above, the New York Court of Appeals has not decided whether insurers must defend insureds in actions alleging failure-to-accommodate discrimination under the language of the Policy. And "issues

15

similar to those raised here [have not] been litigated in New York courts often enough that sufficient precedents exist for us[] to make a determination concerning their proper outcome." *Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218, 231 (2d Cir. 2010) (cleaned up). Second, as interpreted by the New York courts, the language of the Policy is ambiguous with respect to coverage for failure-to-accommodate claims. *See* Section III, *supra*. Third, a decision on the merits would require us to determine whether New York public policy bars the defense of a failure-to-accommodate claim. This would clearly implicate "important public policy choices that the New York Court of Appeals is better situated than we to make." *CIT Bank N.A.*, 948 F.3d at 537 (internal quotation marks omitted). And finally, the answer to the question that we now certify is wholly determinative of the outcome of this appeal.

## V. CONCLUSION

For the foregoing reasons, we certify the following question to the New York Court of Appeals:

> Must a general liability insurance carrier defend an insured in an action alleging discrimination under a failure-to-accommodate theory?

"As is our practice, we do not intend to limit the scope of the Court of Appeals' analysis through the formulation of our question, and we invite the

16

Court of Appeals to expand upon or alter this question as it should deem appropriate." *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 126 (2d Cir. 2011).

It is hereby ORDERED that the Clerk of this Court transmit to the Clerk of the New York Court of Appeals this opinion as our certification, together with a complete set of briefs, appendices, and the record filed in this case by the parties. This panel retains jurisdiction for purposes of resolving this appeal after the disposition of the certification by the New York Court of Appeals.