SECURITIES and EXCHANGE COMMISSION, Plaintiff,

v.

SPONGETECH DELIVERY SYSTEMS, INC., RM Enterprises International, Inc., Steven Y. Moskowitz, Michael E. Metter, George Speranza, Joel Pensley, and Jack Halperin, Defendants,

and

Blue Start Media Group, Inc., Businesstalkradio.Net Acquisition Corp., Relief Defendants.

No. 10–CV–2031 (DLI)(JMA).

United States District Court, E.D. New York.

Signed March 31, 2015.

Filed Dec. 24, 2014.

Paul W. Kisslinger, U.S. Securities and Exchange Commission, Washington, DC, Gary S. Graifman, Kantrowitz Goldhamer & Graifman, Spring Valley, NY, for Plaintiff.

Michael F. Bachner, Scott James Splittgerber, Bachner & Herskovits, P.C., New York, NY, Roger L. Fidler, Law Offices of Roger L. Fidler, Hawthorne, NJ, Chad N. Cagan, Sannenblick Parker & Selvers, P.C., Freehold, NJ, Maranda E. Fritz, Thompson Hine LLP, New York, NY, for Defendants.

Maranda E. Fritz, Thompson Hine LLP, New York, NY, for Relief Defendant Businesstalkradio.Net, Inc.

### *MEMORANDUM AND ORDER*

DORA L. IRIZARRY, District Judge.

The Securities and Exchange Commission ("SEC") initiated the instant enforcement action on May 5, 2010 against defendants Spongetech Delivery Systems, Inc. ("Spongetech"), RM Enterprises International, Inc. ("RM Enterprises"), Steven Y. Moskowitz, Michael E. Metter, George Speranza, Joel Pensley, and Jack Halperin, for violations of several securities laws and rules, including Sections 5 and 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b–5, 17 C.F.R. § 240.10b–5. Over $5 million of the proceeds from the fraud were used to benefit BusinessTalkRadio.net, Inc. ("BTR"), another company in which some of the Spongetech officers were involved. Various parties possess claims against BTR, including the SEC and Solution Funding, LLC ("Solution Funding" or "SF"), a secured creditor of BTR. In light of a related litigation in Delaware state court involving BTR and Solution Funding, the Court established a claims process to resolve the competing claims against BTR. BTR, which is also named as a defendant in the instant action, has been liquidated, yielding approximately $1,046,000, which currently sits in the Eastern District's Court Registry Investment System ("CRIS"). The Court referred the resolution of these competing claims to then-United States Magistrate Judge Joan M. Azrack for a report and recommendation ("R & R"). (*See* July 10, 2013 Order; July 11, 2013 Order; July 8, 2014 Order.) The magistrate judge issued an R & R on December 24, 2014 recommending that the Court award Solution Funding all of the funds in the CRIS Account. (*See generally* R & R, Docket Entry No. 333.) The SEC and Metter objected to the R & R. (*See* SEC's Response and Objection to R & R ("SEC Obj."), Docket Entry No. 334; Objection of Michael Metter to the R & R ("Metter Obj."), Docket Entry No. 335.) For the reasons below, the Court adopts the R & R in its entirety.

### BACKGROUND

The Court incorporates the recitation of the facts as provided in the R & R, and

will recite the facts of this case only to the extent necessary to explain the Court's ruling.

## DISCUSSION

### I. Legal Standard

■ When a party objects to a report and recommendation, a district judge must make a *de novo* determination with respect to those portions of the report and recommendation to which the party objects. *See* Fed.R.Civ.P. 72(b)(3); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir. 1997). If, however, a party makes conclusory or general objections, or attempts to relitigate the party's original arguments, the court will review the report and recommendation for clear error. *See Robinson v. Superintendent, Green Haven Corr. Facility,* 2012 WL 123263, at *1 (E.D.N.Y. Jan. 17, 2012) (quoting *Walker v. Vaughan,* 216 F.Supp.2d 290, 292 (S.D.N.Y.2002)). The district court may then "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R.Civ.P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1).

### II. Analysis

As a result of the claims process this Court established to resolve the competing claims against BTR, two primary questions arose: (1) whether the SEC is entitled to a disgorgement judgment against BTR; and (2) whether Solution Funding's secured claim against BTR should be subordinated or otherwise not enforced. The Court finds that the SEC is entitled to a disgorgement judgment against BTR, and Solution Funding's secured claim against BTR should be enforced without subordination.

### a. SEC is Entitled to a $5.69 Million Disgorgement Judgment against BTR

In the SEC's motion for disbursement, the SEC contended that it is entitled to a disgorgement judgment in the amount of $5.69 million based on the RM Loan. (*See* SEC Mot. for Disbursement, Docket Entry No. 261.) Solution Funding opposed the SEC's motion, and argued primarily that BTR did not receive any ill-gotten gains from the RM Loan because the "RM Loan transaction merely replaced one BTR $5 million obligation with a new, $5 million secured obligation." (SF Opp'n to SEC Mot., Docket Entry No. 272, at 4.) The SEC countered that, *inter alia,* Solution Funding failed to make any showing that BTR actually provided $5 million worth of valuable consideration in exchange for the $5 million from RM Enterprises. (SEC Reply in Further Support of Mot. for Disbursement ("SEC Reply"), Docket Entry No. 276, at 4–5.) The magistrate judge found Solution Funding's arguments in opposition to be meritless and recommends that the Court hold that the SEC established its entitlement to a $5.69 million disgorgement against BTR. (R & R at 545–46.) There were no objections to this recommendation. Upon due consideration, the Court adopts this recommendation and finds that the SEC is entitled to a $5,190,000 disgorgement judgment against BTR, plus prejudgment interest to be calculated as of the date of the entry of the judgment.

### b. Solution Funding is Entitled to Retain Priority

■ The central remaining issue is whether Solution Funding, as a secured creditor, has priority over the SEC's disgorgement judgment. In its motion for disbursement, Solution Funding made two arguments. "First, both the amount and

the enforceability of BTR's obligation to Solution Funding have been definitively established by a judgment entered on November 30, 2012 by the Delaware Court in favor of Solution Funding and against BTR in the amount of $2.5 million." (SF Mot. for Disbursement ("SF Mot."), Docket Entry No. 280, at 1.) "Second, BTR's obligation to Solution Funding is secured by a perfected first priority security interest in all of the assets of BTR and its subsidiaries and in all of the funds currently in the BTR CRIS Account." (*Id.* at 2.) Based upon these propositions, Solution Funding argued that it has priority, up to the amount necessary to satisfy the Delaware Judgment, over all other claims asserted against either those assets or those funds. (*Id.* at 3.)

The SEC opposed this conclusion, and argued that "the Court should find in equity that the SEC's claims for disgorgement have priority over the claims submitted by Solution Funding." (SEC Opp'n to SF Mot. to Distribute ("SEC Opp'n"), Docket Entry No. 281, at 1.) In support of its argument, the SEC analogized the instant proceeding to cases involving SEC "distribution proceedings" and SEC receiverships. The SEC argued that in SEC "distribution proceedings" and receiverships, a court can limit secured claims in whatever manner the court "determines to be fair and reasonable under the circumstances." (SEC Reply at 5.) According to the SEC, under this "fair and reasonable" standard, the Court should limit Solution Funding's secured claim and permit the SEC to take highest priority over the purported secured claims of Solutions Funding. (*Id.*) The SEC further supported its argument by noting that, if the Court were to do otherwise, Solution Funding, which acquired the BC Loan under, "at best, *unusual* circumstances," will receive an unfair "windfall" and the victims of the Spongetech fraud,

will recover nothing. (SEC Opp'n at 5 (emphasis in original).)

Solution Funding countered the SEC's argument contending that the Second Circuit's decision in *F.T.C. v. Bronson Partners LLC,* 654 F.3d 359 (2d Cir.2011) establishes that the SEC's disgorgement judgment is a general unsecured judgment and, therefore, is subordinate to Solution Funding's judgment. The magistrate judge agreed with Solution Funding and recommends that this Court find that Solution Funding's judgment has "priority over the SEC's disgorgement judgment, and [that] the broad equitable principles cited by the SEC do not provide a basis to limit Solution Funding's recovery." (R & R at 546.) For the reasons set forth below, the Court agrees and adopts the magistrate judge's recommendation on this issue.

### i. The Fair and Reasonable Standard is Inapplicable

The SEC objects to the magistrate judge's recommendation that Solution Funding's judgment has priority over the SEC's disgorgement judgment. First, the SEC argues that the magistrate judge incorrectly relied on inapplicable dicta from the *Bronson* decision, while disregarding decisions that support the Court's equitable distribution of BTR assets in favor of the SEC. (*See* SEC Obj. at 3.) Specifically, the SEC contends that the *Bronson* decision does not serve as "a basis for defeating the SEC's equitable claims *entirely,* and eliminating all equitable remedies available to the Court pursuant to Section 21(d)(5) of the Exchange Act." (*Id.* (emphasis in original).) Moreover, the SEC argues that "*Bronson* was a narrow decision that merely upheld the long-standing principle that enforcement agencies, like the FTC and SEC, need not trace funds subject to distribution in order to obtain a

disgorgement order." (*Id.*) According to the SEC, the *Bronson* court provided no discussion of how to resolve competing claims between competing claimants, whether holding secured or unsecured claims, and did not purport to limit a district court's equitable powers in SEC disgorgement proceedings, as the magistrate judge held. (*Id.* at 3–4.)

The SEC is not presenting any new arguments in this objection. The SEC merely reiterates its previous argument that the Court is not required to rigidly adopt or adhere to state priority laws in SEC disgorgement proceedings because Section 21(d)(5) of the Exchange Act provides the Court with "broad equitable powers to do what is necessary and appropriate to benefit shareholders." (*Id.* at 3–4.) The SEC again attempts again to analogize the instant claims process to a court addressing competing claims in SEC disgorgement proceedings and employing its equitable powers under the Exchange Act to issue fair and reasonable distributions that are not bound by formal state law constraints. (*Id.* at 4.) The SEC continually invokes equitable considerations, including by noting the supposedly "convoluted and irregular transactions giving rise to Solution Funding's claim." (*Id.* at 6.) At its core, the SEC's primary argument in its objections remains the same, which is that "the court in equity may decide not to adhere to state law priority rules." (*Id.* at 6.)

As the SEC presented this same argument to the magistrate judge, the Court will review this objection for clear error. *See Robinson v. Superintendent, Green Haven Correctional Facility*, 2012 WL 123263, at *1 (E.D.N.Y. Jan. 17, 2012) (quoting *Walker v. Vaughan*, 216 F.Supp.2d 290, 292 (S.D.N.Y.2002)) ("However, when a party makes only conclusory or general objections, or simply reiterates

his original arguments, the Court reviews the Report and Recommendation only for clear error."). The Court finds no error, much less clear error, with the magistrate judge's finding regarding the scope of the Court's equitable powers in the instant action, because: (1) the Second Circuit's decision in *Bronson* indicates that the SEC's disgorgement judgment does not have priority over a secured claim; (2) the cited cases involving SEC distribution proceedings are not on point; and (3) principles of law and equity further suggest that the Court should not be quick to disregard state law priority rules.

First, in *F.T.C. v. Bronson Partners, LLC*, the defendant argued that, in order to receive a disgorgement judgment, the Federal Trade Commission ("FTC") was required to use the principles of tracing to trace specific funds to the defendants' unlawful conduct. 654 F.3d 359, 372 (2d Cir.2011). The Second Circuit rejected this argument because, in order to obtain and enforce disgorgement judgments, the FTC and the SEC are not required to identify specific funds in the defendant's possession that were obtained through the unlawful conduct at issue. *Id.* at 373. The Second Circuit engaged in an extensive analysis of the disgorgement remedy in the context of enforcement actions and went on to explain the consequences of its holding and noted that "an agency that has won a disgorgement order [is not] entitled to priority over the other creditors of the defendant." *Id.* at 372–375. The *Bronson* court added that, if the defendant turned out to be insolvent, the disgorgement judgment obtained would only permit the agency to "share with other creditors on an equal basis." *Id.* at 374. This analysis led the magistrate judge "to conclude that such a disgorgement judgment has the same priority as other unsecured claims." (R & R at 547.) The Court agrees. The *Bronson* decision supports a holding that

that the SEC's disgorgement judgment is a general unsecured judgment and, therefore, is subordinate to Solution Funding's secured judgment.

■ Second, the SEC's renewed attempt to compare SEC distribution proceedings to the instant claims process is unpersuasive. As the magistrate judge noted, "Courts look to the 'fair and reasonable' standard in reviewing the SEC's plans to distribute funds to investors that have been disgorged by a defendant and are, essentially, already in the SEC's possession." (R & R at 547 (citing *S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991) (analyzing distribution of disgorgement consent judgment); *Official Comm. of Unsecured Creditors of WorldCom ("WorldCom"), Inc. v. S.E.C.*, 467 F.3d 73, 82–84 (2d Cir.2006) (analyzing distribution of SEC's of "Fair Fund" recovery, which includes disgorgement and related civil penalties)).) In its objection, the SEC argues that "these cases involve the equitable distribution of assets in contested SEC disgorgement proceedings, between claimants raising legal and equitable claims, and are thus more analogous to this proceeding than the cited dicta from *Bronson*." (SEC Obj. at 5.) The Court disagrees.

The instant claims process, which centers on the SEC's disgorgement claim vis-à-vis other creditors, is a different issue from whether the SEC's plan for distributing those funds is fair and reasonable, as would be the question in a typical SEC distribution proceeding. The proceedings the SEC highlights often are focused on weighing the competing equitable interests of victimized investors vis-à-vis each other, and, unlike here, generally do not focus on creditors, particularly secured creditors. The magistrate judge previously scrutinized whether these proceedings provided sufficient support for the Court's power to

employ the broad equitable principles espoused by the SEC to limit Solution Funding's secured judgment and concluded that they did not. SEC's attempt to rehash these same arguments fails to demonstrate the clear error necessary to depart from the magistrate judge's thorough and correct analysis and resulting recommendation.

■ Third, the SEC provides an insufficient basis to stray from the principle that equity follows the law. As Solution Funding notes, "In essence, the SEC's argument is that Section 21(d)(5) of the Securities Exchange Act creates power in the federal courts to subordinate claims having lawful priority regardless of their validity and regardless of whether the persons holding such claims have engaged in 'egregiously inequitable conduct' such as might support equitable subordination, or, indeed, have engaged in *any* misconduct." (SF's Reply to SEC's Opp., Docket Entry No. 339, at 2.) It is certainly true that the choice of an appropriate remedy for violations of the federal securities statutes is a question of federal law, committed to the equitable discretion of this Court. *See, e.g., SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir.1997); *SEC v. Certain Unknown Purchasers of Common Stock of and Call Options for Common Stock of Santa Fe Int'l Corp.*, 817 F.2d 1018, 1020 (2d Cir.1987). Even with that discretion, "[t]he Court's equitable authority, however, does not extend to abrogating property rights created by state law and protected by due process; equity follows the law." *SEC v. Haligiannis*, 608 F.Supp.2d 444, 449 (S.D.N.Y.2009) (citing *Hedges v. Dixon County*, 150 U.S. 182, 192, 14 S.Ct. 71, 37 L.Ed. 1044 (1893)). In the instant case, the priority of Solution Funding's first position security interest over the SEC's unsecured interest in the CRIS Account funds is defined and established by law,

and the SEC and Metter have not presented this Court with a basis for why equity has the power to change Solution Funding's rights. Relatedly, the Court denies Metter's request for a hearing on these issues, as such a hearing is unnecessary.

### c. The Claims Order Bars Subordination of Solution Funding's Judgment

■ In addition to the SEC's primary argument regarding the "fair and reasonable" standard addressed above, Metter, the SEC, and the Lead Plaintiffs also argued that Solution Funding's claim should be subordinated or not enforced because Solution Funding was involved in inequitable conduct that includes a breach of fiduciary duty by Michael Pisani Sr., who was a member of BTR's board. In opposition, Solution Funding asserted that the Court's June 20, 2012 Order ("Claim Order"), which established the instant claims process, precludes any equitable re-ordering of priorities and is limited solely to determining the facial priority of the various claims. (SF Mot. at 6–9.)

The Claims Order directs claimants to file claims setting out the basis of their assertion "of priority over other creditors." (June 20, 2012 Order, Docket Entry No. 234, at 2–3.) Further, the Claims Order states that "[c]reditors shall have *the same relative priority* with regard to all proceeds of sale deposited in the CRIS account as they possessed with respect to the assets made to facilitate their sale, or as they possessed with respect to such proceeds prior to their deposit in the CRIS account." (*Id.* at 3 (emphasis added).) Relatedly, the joint motion submitted by the SEC, Solution Funding, and other relevant parties when they asked the Court to approve the Claims Order, which the parties had proposed to the Court, states: "[t]he SEC ... has advised counsel for

Solution Funding that it is prepared to cooperate with Solution Funding and other interested parties to ensure that the proceeds of the sale of the assets of [BTR] will be disposed of fairly, appropriately *and in accordance with the current priority among creditors under the governing law.*" (Joint Mot. to Establish Procedure for Disposition of Proceeds, Docket Entry No. 233, at 2 (emphasis added).)

The magistrate judge held that the resulting language in the Claims Order "indicates that the Court cannot alter the claimants' relative priority to the proceeds." (R & R at 550.) The SEC objects to this finding and argues that "the Claims Order does not limit the Court's ability to apply its equitable powers under Section 21(d)(5) of the Exchange Act, as set forth above, nor should it be interpreted in this fashion." (SEC. Obj. at 7.) Metter also objects and maintains that the Claims Order and the preceding joint motion "only reflect that the creditors' priority is not disrupted by virtue of the claims process, but they do not provide that issues relating to the prior breach of fiduciary duties are somehow eradicated." (Metter Obj. at 19.) Metter adds, "Rather, those filings confirm that, if the prior claims are valid, they will still retain the priority that existed before deposit of proceeds into the CRIS account, leaving to be determined the issue of whether that claimed priority is valid and enforceable." (*Id.*)

Upon a *de novo* review of whether the Claims Order bars review of the underlying priorities of claims held by the various claimants, the Court finds that it does. The SEC and Metter effectively are asking the Court to disregard the very order governing distribution of funds that SEC and Metter (in his then capacity as chief executive officer of BTR and Blue Star Media Group, Inc.) jointly asked the Court to

enter. In reliance on the Claims Order, Solution Funding agreed to forego any self-help, such as filing its motion to intervene, and, instead, acceded to the process for determining claims priority and distribution reflected in the Claims Order. The SEC and Metter may not circumvent the very claims process that the SEC sought to establish in return for Solution Funding's agreement to forego self-help.

Moreover, the plain language of the Claims Order and the parties' joint request for the Order denote that the Claims Order was not intended to allow reordering of priorities under equitable subordination. The Court agrees with Solution Funding that such an effort by the SEC to undercut the process it requested is barred by equitable estoppel. (SF Resp. to Metter Objections and SEC Objections, Docket Entry No. 337, at 6); *see also CBF Industria de Gusa S/A v. Steel Base Trade AG*, 2015 WL 1191269, at *4 (S.D.N.Y. Mar. 16, 2015) ("Equitable estoppel can be invoked to stop a party from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to its detriment." (citing *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 725 (2d Cir.2001))). Accordingly, the Court denies the requests of Metter and the SEC to alter the priority of Solution Judgment's judgment.

#### d. Metter's Objection Regarding the Enforcement of Foreign Judgments is Meritless

 The bulk of the parties' arguments concern whether Solution Funding's claim should be subordinated. However, one party, Metter, challenged the validity of Solution Funding's judgment, which was. entered upon the Receiver's consent in the Delaware Chancery Court. The magistrate judge rejected Metter's argument that Solution Funding's judgment is unenforceable because Solution Funding has not complied with New York law concerning the enforcement of foreign judgments. (R & R at 551 n. 13.) Metter objects to this finding, arguing that "[t]he procedures employed by Solution Funding in connection with the disbursement proceedings were wholly inadequate for enforcement of a Delaware judgment in a New York court." (Metter Obj.) Metter contends that, under New York state law, the Receiver's consent judgment is not automatically enforceable and this Court can inquire into whether the consent judgment involved fraud or collusion. (*Id.*) Because the magistrate judge did not substantively respond to this argument, the Court will review the issue *de novo*.

Metter's argument is specious. His attempt to analogize the Receiver's consent judgment to default judgments and confessions of judgments is not persuasive. *See Mallan v. Samowich*, 94 A.D.2d 249, 253, 464 N.Y.S.2d 122 (1st Dep't 1983) ("CPLR 5401 ... only [bars enforcement of] default and confession judgments."). Metter also argues that when parties "are relying on a stipulated judgment, the courts will look at whether the judgment involved 'fraud, collusion, mistake, accident,' or some other defect." (Metter Obj. at 18 (citing *Canino v. Electronic Tech. Co.*, 49 A.D.3d 1050, 1051, 856 N.Y.S.2d 683 (3d Dep't 2008) and *Cadle Co. v. Tri–Angle Assoc.*, 18 A.D.3d 100, 798 N.Y.S.2d 360 (1st Dep't 2005))). Neither of the cases Metter cites in support of this proposition have any relevance to the instant proceeding. Moreover, although an exception to the full faith and credit clause exists where the state court judgment was obtained by collusion or fraud, Metter points to no evidence of such collusion or fraud. In fact, the detailed motion to approve the

consent judgment that the Receiver filed in the Delaware court indicates the contrary. Metter's suggestion that the Receiver's actions constitute collusion is baseless. Accordingly, Metter's objection that Solution Funding's judgment is not entitled to full faith and credit or enforcement is meritless, and the magistrate judge's recommendation is adopted.

### e. Claims of the Remaining Unsecured Creditors

The magistrate judge also recommended denial of the motion for disbursement by Hinshaw & Culbertson and Ashby & Geddes, who were counsel to BTR during Metter's tenure as President and performed legal services for BTR from January 2012 through October 2012. (R & R at 554–56. The magistrate judge also recommends denial of Metter's request for payment for unused vacation time during 2011 and 2012. (*Id.* at 556.) Lastly, the magistrate judge recommends denial of disbursement claims from Cohn Birnbaum & Shea P.C. (another law firm), and state and federal taxing authorities. (*Id.* at 556–57.) There were no objections to any of these recommendations. Upon due consideration, these recommendations are adopted in full.

### CONCLUSION

For the foregoing reasons, the Court adopts the R & R in its entirety. Solution Funding's Motion for Disbursement is granted and, having found that Solution Funding has a priority secured interest, it is awarded all of the funds in the CRIS Account in satisfaction of its $2.5 million judgment against BTR, plus prejudgment interest to be calculated as of the date of the entry of the judgment. Further, the SEC is entitled to a $5,190,000 disgorge-

ment judgment against BTR, plus prejudgment interest to be calculated as of the date of the entry of the judgment; however the SEC's disgorgement judgment is subordinate to Solution Funding's judgment. The Motions for Disbursement filed by the other claimants are denied. SO ORDERED.

### *REPORT AND RECOMMENDATION*

AZRACK, United States Magistrate Judge:

In May 2010, the United States Securities and Exchange Commission ("SEC") sued Spongetech Delivery Systems, Inc. ("Spongetech") and certain Spongetech officers and employees for engaging in securities fraud. More than $5 million of the proceeds from the fraud were used to benefit BusinessTalkRadio.net, Inc. ("BTR"), another company in which some of the Spongetech officers were involved. Various parties possess claims against BTR, including the SEC and Solution Funding, LLC ("Solution Funding" or "SF"), a secured creditor of BTR. In light of a related litigation in Delaware state court involving BTR and Solution Funding, the Honorable Dora L. Irizarry established a claims process in this Court to resolve the competing claims against BTR. BTR, which is also named as a defendant in the instant action,[1] has been liquidated, yielding approximately $1,046,000, which currently sits in the Eastern District's Court Registry Investment System ("CRIS").

Judge Irizarry referred the resolution of these competing claims to me for a report and recommendation. (July 10, 2013 Order; July 11, 2013 Order; July 8, 2014 Order.) For the reasons explained below, I respectfully recommend that the Court

---

**1.** Through a merger transaction in 2009, BTR was transformed into BusinessTalkradio.Net Acquisition Corp—only the latter entity is technically a defendant in this action.

award Solution Funding all of the funds in the CRIS Account.

## I. BACKGROUND

### A. The Relevant Entities and Individuals

Michael Metter was the President of BTR, a media company that owned radio stations and produced radio programming. (Decl. of M. Alexander Koch ("Koch Decl.") ¶ 4, ECF No. 265.) In 2006, BTR purchased two radio stations by borrowing $5.5 million from Media Funding Company, LLC and BC Media Funding II, LLC (collectively, "BC Media"). (BC Media Loan Agreement ("BC Loan Agreement"), Koch Decl., Ex. C.) In return, BC Media received a first position security interest in all of BTR's assets. (*Id.;* Decl. of Michael B. Pisani ("Pisani Jr. Decl.") ¶¶ 3–6, ECF No. 267.) Metter, Michael Pisani Sr.,[2] Frank Lazauskas, and a fourth individual (collectively, the "Guarantors") personally guaranteed the $5.5 million loan from BC Media (the "BC Loan"). (BC Loan Agreement; Pisani Jr. Decl. ¶ 7.) Metter, Pisani Sr., and Lazauskas were all members of BTR's board. (Reply Aff. of Michael Metter ("Metter Reply Aff.") ¶ 5, ECF No. 271.)

In addition to his position at BTR, Metter was also the President and CEO of Spongetech, a company that sold soap-filled sponges. (Mar. 14, 2011 Opinion and Order ("2011 Order") at 2, ECF No. 112.) Stephen Moskowitz was Spongetech's Chief Operating Officer and a member of Spongetech's board. (*Id.* at 2.) Metter and Moskowitz engineered a securities fraud involving Spongetech's shares. (*Id.* at 3–7.) Metter and Moskowitz were also directors of an entity called RM Enterprises. (Koch Decl. ¶ 3; 2011 Order at 2 n. 2.) RM Enterprises was the majority shareholder of Spongetech. (2011 Order at 2.) As explained below, RM Enterprises eventually linked BTR to the Spongetech fraud.

### B. BTR's Default on the BC Loan and RM Enterprises' $5 Million Loan to BTR

BTR defaulted on the BC Loan in 2007. (Pisani Jr. Decl. ¶ 9; Aff. of Michael B. Pisani filed in Delaware Chancery Ct. Action ("Pisani Jr. Delaware Aff.") ¶¶ 11, 12, Ex. 2 to Decl. of Michael B. Pisani in Supp. of SF's Sur–Reply ("Pisani Jr. Sur–Reply Decl."), ECF No. 298.) BC Media then sued Metter, Pisani Sr., and the other Guarantors in the Southern District of New York and obtained a $5.7 million judgment against them in October 2008. (*See B.C. Media Funding Co. II v. Lazauskas,* No. 08–CV–6228, 2008 WL 4735236 (S.D.N.Y.2008); Guarantor Judgments, Koch Decl. Ex. E; Koch Decl. ¶ 6.) In response to BC Media's collection efforts against the Guarantors, Pisani Sr. filed bankruptcy in April of 2009. (Koch Decl. ¶ 7; Bankruptcy Filing, Aff. of Maranda Fritz in Opp'n to SF's Mot. for Disbursement ("Fritz Opp'n Aff.") Ex. 1, ECF No. 282.) At various points over the next year, BC Media pursued challenges in Pisani Sr.'s bankruptcy proceeding. (*See, e.g.,* BC Media's May 19, 2009 Objection, Fritz Opp'n Aff. Ex. 2.)

In June 2009, BTR and the Guarantors agreed to settle with BC Media for $6 million. (June 2009 Settlement Agreement ¶¶ 3.1–3.3, Fritz Opp'n Aff. Ex. 5.) To pay the settlement, BTR negotiated a $6 million loan (the "RM Loan") from RM

---

**2.** This case involves two individuals named Michael Pisani. Michael Pisani Sr. ("Pisani Sr.") was a member of BTR's board. His son, Michael Pisani Jr. ("Pisani Jr."), is a lawyer who represented Solution Funding's principal during some of the events at issue here. .

Enterprises that RM Enterprises funded with proceeds from the Spongetech fraud.[3] (Koch Decl. ¶¶ 10–14.) The RM Loan provided the Guarantors with an enormous benefit because, unlike the BC Loan, there were no personal guarantors on the RM Loan. (*Id.* at ¶ 10.) At the time of this transaction, RM Enterprises' directors were Metter, Lazauskas, and Moskowitz. (*Id.*)

Between June 26, 2009 and September 22, 2009, BTR received $5 million from RM Enterprises. (Koch Decl. ¶¶ 11–13.) The $5 million was then paid to BC Media. (*Id.*) Those payments extinguished $5 million of personal liability for each of the Guarantors. RM Enterprises, however, failed to make the final $1 million payment pursuant to the RM Loan. (Fritz Opp'n Aff. ¶ 9.) BTR and the Guarantors then defaulted under the settlement agreement with BC Media. (Fritz Opp'n Aff. ¶ 9.) After BC Media credited BTR's $5 million payment, the BC Loan still had a balance of over $1.5 million. (Pisani Jr. Delaware Aff. ¶¶ 31–32, 39–41.)

Although the RM Loan gave RM Enterprises a lien on all of BTR's assets, BTR's failure to make the final $1 million settlement payment to BC Media meant that BC Media's outstanding lien on BTR's assets retained priority over RM Enterprises' lien. (*See* RM Loan Documents ¶¶ 1.3, 2.1, Ex. 10.1 to Map VI's Form 8–K, Koch Decl. Ex. H.)

## C. Allegations of Securities Fraud at Spongetech

RM Enterprises' failure to provide the final $1 million payment under the RM Loan coincided with the publication of articles in the New York Post that accused Spongetech of running a stock manipulation scheme. (*See* Compl. ¶¶ 30–32, 34, 37, *Le v. Spongetech Delivery Systems, Inc.,* 09–CV–8616, ECF No. 1 (E.D.N.Y. Oct 1, 2009).) Following those articles, in September and October 2009:(1) the SEC sent Spongetech a formal letter of investigation and temporarily suspended the trading of Spongetech's stock, (*id.* ¶¶ 36, 41); and (2) Spongetech shareholders filed securities fraud class actions against Spongetech, Metter, Moskowitz, Lazauskas, and RM Enterprises, (*Id. passim; Orlan v. Spongetech Delivery Systems, Inc.,* 10–CV–4093 (E.D.N.Y. Sept. 8, 2010).)

## D. Solution Funding Purchases the BC Loan

In December 2009, the Guarantors and BC Media reached another settlement in which the Guarantors were to pay $1.1 million by January 31, 2010. (Tr. of Dec. 4, 2009 SDNY Hr'g, Fritz Opp'n Aff. Ex. 9.) The Guarantors, however, were only able to pay BC Media approximately $670,000 by the January 31 payment deadline. (Pisani Jr. Delaware Aff. ¶ 49.) In February 2010, BC Media resumed a challenge to Pisani Sr.'s bankruptcy filing. (Feb. 18, 2010 Ltr. from BC Media to Bankruptcy Court ("Feb. 10 Letter"), Fritz Opp'n Aff. Ex. 13.)

In March 2010, Pisani Sr.'s friend, Charles Lanktree, purchased the outstanding BC Loan through Solution Funding. (Pisani Jr. Delaware Aff. ¶¶ 61–62; SF Loan Purchase Agreement, Fritz Opp'n Aff. Ex. 16.) Solution Funding paid BC Media $445,000 for the BC Loan and BC Media's judgments from the Guarantors (the "Guarantor Judgments"). (*Id.;* SF Loan Purchase Agreement, Fritz Opp'n

---

**3.** The RM Loan also involved BTR's parent corporation, Map VI Acquisition, Inc. ("Map VI"). Map VI was the entity that actually incurred the $6 million loan obligation even though the proceeds of the RM Loan were used to benefit BTR and the Guarantors. The details of the RM Loan are set out in the SEC's papers. (*See* Koch Decl. ¶ 10.)

Aff. Ex. 16.) As part of this transaction, Pisani Sr. contributed $138,000 of funds that were the subject of a dispute with BC Media in his bankruptcy proceeding. (SF Loan Purchase Agreement.) At the time of Solution Funding's purchase in March 2010, the BC Loan had a face value of over $1.5 million. (Pisani Jr. Delaware Aff. ¶¶ 63–64.) Solution Funding assumed BC Media's first position security interest in BTR's assets. (*Id.* ¶ 55 n. 7.) After Solution Funding's purchase of the BC Loan, BTR never made any payments on the loan to Solution Funding.[4]

### E. The SEC Files Suit against Spongetech and Metter

In May 2010, the SEC filed suit against Spongetech, RM Enterprises, Metter, Moskowitz, and three other individuals alleging that they engaged in an unlawful "pump and dump" scheme. (Compl. ¶ 1, ECF No. 1.) Pursuant to this scheme, the defendants: (1) made public statements about fake customers and revenue; and (2) then flooded the market with Spongetech shares by selling the shares through affiliated entities in unregistered transactions. (*Id.*)

In March 2011, Judge Irizarry granted a preliminary injunction against the defendants. (2011 Order at 34–36.) The SEC, however, permitted Metter's continued employment at BTR. (*See, e.g.,* Mar. 28,

2011 Order; June 14, 2011 Order, ECF No. 158.)

### F. Solution Funding Files Suit against BTR in Delaware State Court

In January 2012, Solution Funding filed suit against BTR in the Delaware Chancery Court over the unpaid BC Loan and immediately filed a motion for appointment of a receiver over BTR. (Pisani Jr. Decl. ¶¶ 17–18.) The BC Loan Agreement explicitly granted Solution Funding the right to have a receiver appointed in the event of default. (BC Loan Agreement ¶ 8.1.) BTR opposed Solution Funding's motion, arguing, *inter alia,* that the appointment of a receiver was inappropriate because Solution Funding had "unclean hands" based on Pisani Sr.'s involvement in the Solution Funding transaction and alleged breach of his fiduciary duty. (BTR's Supp. Opp'n Submission filed in the Delaware Chancery Court, Ex. 3 to Aff. of Maranda Fritz in Supp. of Mot. for Disbursement ("Fritz Aff."), ECF No. 259.). The Delaware Chancery Court rejected this argument based on the record before it and granted Solution Funding's motion.[5] (June 20, 2012 Tr. 45–46, Pisani Jr. Decl. Ex. 5.) On July 18, 2012, the court appointed Michael Craven ("the Receiver") as the receiver for BTR, with broad powers to run BTR and to sell BTR's assets to satisfy BTR's obligations

---

4. Certain parties in the instant claims proceeding contend that Pisani Sr.'s actions concerning Solution Funding's purchase of the BC Loan violated his fiduciary duties to BTR and constitute inequitable conduct, and that such misconduct is imputable to Solution Funding. Details about the circumstances surrounding the December 2009 settlement agreement and Solution Funding's purchase of the BC Loan are discussed *infra.*

5. In addressing Solution Funding's motion, the Delaware Chancery Court observed that "it appears ... unlikely that [BTR] will dem-

onstrate a cognizable claim for breach of fiduciary duty against [Pisani Sr.], who is entitled to protect his interests as a lender and a guarantor." (June 20, 2012 Tr. at 44–45.) However, the Delaware Chancery Court ultimately did not reach the question of whether Pisani Sr. breached his fiduciary duties because the court held that any breach by Pisani Sr. could not, based on the record before it, be imputed to Solution Funding as there was no evidence that Pisani Sr. had any control over Solution Funding. (June 20, 2012 Tr. 45–46.)

to Solution Funding. (Order Appointing Receiver, Pisani Jr. Decl. Ex. 6.) In October 2012, the Receiver removed Metter as President of BTR. (Metter Reply Aff. ¶ 1.)

After investigating Solution Funding's claim and BTR's defenses, the Receiver agreed to settle with Solution Funding. (Receiver's Mot. to Approve Consent Judgment ("Consent Mot."), Ex. A to Response of Craven to Mot. for Disbursement, ECF No. 268.) The Delaware Chancery Court then granted the Receiver's motion to approve a consent judgment against BTR for $2.5 million, finding it to be a reasonable exercise of discretion and business judgment. (Stipulation and Order, Pisani Jr. Decl. Ex. 9; Order Approving Consent to Judgment, Pisani Jr. Decl. Ex. 8.)

### G. The Claims Process is Established in this Court

During the pendency of Solution Funding's motion to appoint a receiver in Delaware, the SEC filed an amended complaint in March 2012 naming BTR as a relief defendant so that the SEC could seek disgorgement of the benefits of the RM Loan from BTR. (Am. Compl., ECF No. 219.) Shortly before the Delaware Chancery Court granted Solution Funding's receivership motion, the SEC, Solution Funding, and other interested parties agreed to establish a claims procedure before Judge Irizarry to determine which parties are entitled to recover the proceeds from the sale of BTR's assets. (June 20, 2012 Order, ECF No. 234; Joint Mot. to Establish Procedure for Disposition of Proceeds ("Joint Mot."), ECF No. 233.)

Since the establishment of the claims process, most of the defendants, including Metter, consented to entry of judgment against them. (Metter Consent Judgment, ECF No. 255.) BTR has not consented to a judgment against it. In the consent judgment against Metter, he agreed to pay disgorgement, interest, civil penalties, and reimbursement in amounts to be determined by the Court. (Id.)

## II. DISCUSSION

Solution Funding, the SEC, and various other parties have filed claims pursuant to Judge Irizarry's June 20, 2012 order. The Receiver has declined to take a position on the priority of the various claimants.

Solution Funding already possesses a secured judgment against BTR of $2.5 million that far exceeds the $1,046,000 in the CRIS account. The SEC's motion for disbursement argues that it is entitled to a $5.69 million disgorgement judgment against BTR. As explained below, the SEC is entitled to its requested judgment.

The central issue, however, is whether Solution Funding, as a secured creditor, has priority over the SEC's disgorgement judgment. The SEC, the Sullivan Lead Plaintiff Group from one of the Spongetech class actions (the "Lead Plaintiffs"), and Metter raise various arguments as to why Solution Funding's claim does not have priority.

As explained below, none of the arguments raised by the SEC, the Lead Plaintiffs or Metter are persuasive. Accordingly, I conclude that Solution Funding's judgment has priority over the SEC's disgorgement judgment.

The various other creditors who have filed claims, including former employees and the Internal Revenue Service ("IRS"), are also not entitled to recover any funds over Solution Funding's secured judgment. Finally, Metter and Hinshaw & Culbertson LLP ("Hinshaw"), BTR's former counsel, raise additional arguments as to why their claims, while unsecured, are nevertheless

unique and should be given first priority. Their arguments are also not persuasive.

## A. The SEC is Entitled to a $5.69 Million Disgorgement Judgment against BTR

■ District courts may order disgorgement against a relief defendant when the relief defendant received "ill-gotten funds" and "lacks a 'legitimate claim' to the funds." *S.E.C. v. Cavanagh,* 155 F.3d 129, 136 (2d Cir.1998); *accord Commodity Futures Trading Comm'n v. Walsh,* 618 F.3d 218, 226 (2d Cir.2010). "[A] good-faith purchaser for value may not be ordered to disgorge assets originating from a defendant's ill-gotten gains." *S.E.C. v. Constantin,* 939 F.Supp.2d 288, 311 (S.D.N.Y.2013) (citing *Walsh,* 618 F.3d 218). On the other hand, a court may award the SEC disgorgement against a relief defendant who did not provide adequate consideration in exchange for the assets at issue. *See Walsh,* 618 F.3d at 227–29 (explaining that, in order to qualify as a good faith purchaser for value under state law, relief defendant must provide "fair consideration") (quoting New York Debtor and Creditor Law § 278); *Constantin,* 939 F.Supp.2d at 311–12; *S.E.C. v. China Energy Sav. Tech., Inc.,* 636 F.Supp.2d 199, 206 (E.D.N.Y.2009) ("[T]he Relief Defendants have failed to make any showing that the shares [at issue] were received in exchange for adequate consideration.").

■ In the SEC's motion for disbursement, the SEC contended that it was entitled to a disgorgement judgment in the amount of $5.69 million based on the RM Loan.[6] Solution Funding opposed the SEC's motion, arguing, primarily, that

BTR did not receive any ill-gotten gains from the RM Loan because the "RM Loan transaction merely replaced one BTR $5 million obligation with a new, $5 million secured obligation." (SF Opp'n to SEC Mot. at 4, ECF No. 272.) The SEC's reply brief responded that, *inter alia,* Solution Funding failed to make any showing that BTR actually provided $5 million worth of valuable consideration in exchange for the $5 million from RM Enterprises. Subsequently, Solution Funding filed its own motion for disbursement. In that motion, Solution Funding elected not to address the disgorgement claim. (SF Mot. for Disbursement ("SF Mot.") at 5 n. 7, ECF No. 280.) arguments in the SEC's reply brief concerning the validity of the SEC's

The facts concerning the SEC's disgorgement claim are detailed in the SEC's papers. (*See* Koch Decl.) Solution Funding does not contest those facts, and it is unnecessary to recite them here.

I find that the SEC has established its entitlement to a $5.69 million disgorgement judgment. The arguments raised by Solution Funding in opposition are meritless. Solution Funding has not even attempted to establish that BTR gave adequate consideration for the $5 million loan it received from RM Enterprises or for the additional $190,000 BTR received. *See Constantin,* 939 F.Supp.2d at 312 (awarding disgorgement where relief defendant did not submit "any evidence to suggest, that the company paid adequate consideration for its receipt of [the funds at issue]"). Moreover, the record affirmatively establishes that adequate consideration was lacking: (1) the sale of BTR's assets ultimately netted only $1 million; (2) al-

---

6. The $5 million benefit that BTR received from the RM Loan comprises the bulk of the SEC's disgorgement claim. The SEC also seeks disgorgement of an additional $160,000 "loan" from RM Enterprises to BTR in 2008 and a $30,000 benefit BTR obtained through a 2008 transaction that involved Spongetech stock. (Koch Decl. ¶¶ 15–16.)

though BC Media possessed a first priority claim against BTR with a face value of $1.5 million, BC Media was willing to sell that claim at a substantial discount; (3) inexplicably, RM Enterprises was willing to loan BTR $5 million even though RM Enterprises was not even assured a first priority security interest for its loan. Given the above, BTR does not have a legitimate claim to the funds it received from RM Enterprises. Additionally, I fail to see how BTR is equivalent to a good faith purchaser given that Metter was on both sides of the RM Loan transaction.

Finally, Solution Funding argues that BTR did not receive a benefit because the proceeds from the $5 million RM Loan were paid to BTR's parent, and the those funds were never in BTR's possession. This argument is meritless—BTR clearly received a benefit when BTR's parent company used these funds to pay BTR's indebtedness to BC Media.

The SEC is entitled to a $5,695,425 disgorgement judgment against BTR.[7]

## B. The SEC's and the Lead Plaintiffs' "Fair and Reasonable" Argument

The SEC and the Lead Plaintiffs argue that "the Court should find in equity that the SEC's claims for disgorgement have priority over the claims submitted by Solution Funding." (SEC Opp'n to SF Mot. to Distribute ("SEC Opp'n") at 1, ECF No. 281) In support of this argument, the SEC attempts to analogize the instant proceeding to cases involving SEC "distribution proceedings" and SEC receiverships. The SEC argues that in SEC "distribution proceedings" and receiverships, a court can limit secured claims in whatever manner the court "determines to be fair and reasonable under the circumstances." (SEC's

Reply Supp. Mot. for Disbursement ("SEC Reply") at 5, ECF No. 276.) According to the SEC, under this "fair and reasonable" standard, the Court should limit Solution Funding's secured claim because otherwise Solution Funding, which acquired the BC Loan under "at best, *unusual* circumstances," will receive an unfair "windfall" and Spongetech's investors, the victims of the fraud, will recover nothing. (SEC Opp'n at 5.) The SEC maintains that, under this equitable standard, the "Court need not find that [Pisani Sr.'s] conduct was 'imputable to Solution Funding,'" (SEC Opp'n at 5), or that Pisani Sr. committed any misconduct in the first instance, (SEC Reply at 7), in order to limit Solution Funding's claim.

Solution Funding responds that the Second Circuit's decision in *F.T.C. v. Bronson Partners* establishes that the SEC's disgorgement judgment is a general unsecured judgment and is therefore subordinate to Solution Funding's judgment.

As explained below, Solution Funding is correct-its judgment has priority over the SEC's disgorgement judgment, and the broad equitable principles cited by the SEC do not provide a basis to limit Solution Funding's recovery.

## 1. The Second Circuit's Decision in *FTC v. Bronson Partners* Indicates that the SEC's Disgorgement Judgment Does Not Have Priority over A Secured Claim

In *F.T.C. v. Bronson Partners, LLC*, the defendant argued that, in order to receive a disgorgement judgment, the Federal Trade Commission ("FTC") was required to use the principles of tracing to trace specific funds to the defendants' unlawful

---

7. This total includes interest through the date of the SEC's motion for disbursement. If, at some later point in the proceedings, it is necessary to calculate additional interest that has accrued since the filing of the SEC's motion, the Court will do so.

conduct. 654 F.3d 359, 372 (2d Cir.2011). The Second Circuit rejected this argument because, in order to obtain disgorgement judgments, the FTC and the SEC are not required to identify specific funds in the defendant's possession that were obtained through the unlawful conduct at issue. *Id.* at 373. The Second Circuit went on to explain the consequences of its holding—if the defendant turned out to be insolvent, the disgorgement judgment obtained would only permit the Commission to recover on "an equal basis" with other creditors. *Id.* at 374. Although no court presiding over an insolvency proceeding has yet applied *Bronson Partners* to conclude that such a disgorgement judgment has the same priority as other unsecured claims, *Bronson Partners'* extensive analysis of the disgorgement remedy is highly persuasive and indicate that would be the result.

The SEC never directly responds to *Bronson Partners* or argues that BTR's assets were traceable to the Spongetech fraud. Instead, the SEC points to a handful of cases involving SEC distribution proceedings and receiverships. As explained below, none of these cases persuade me to adopt the SEC's position here.

### 2. Cases Involving SEC Distribution Proceedings Are Not on Point

The SEC's attempt to analogize the instant claims process to a mere "distribution" proceeding is flawed. Courts look to the "fair and reasonable" standard in reviewing the SEC's plans to distribute funds to investors that have been disgorged by a defendant and are, essentially, already in the SEC's possession. *See S.E.C. v. Wang,* 944 F.2d 80, 85 (2d Cir. 1991) (analyzing distribution of disgorgement consent judgment); *Official Comm. of Unsecured Creditors of WorldCom ("WorldCom"), Inc. v. S.E.C.,* 467 F.3d 73,

82–84 (2d Cir.2006) (analyzing distribution of SEC's of "Fair Fund" recovery, which includes disgorgement and related civil penalties). In these cases, the priority of the SEC's disgorgement claim vis-à-vis other creditors was not at issue. Rather, the SEC already had obtained the disgorged funds—the only question was whether the SEC's plan for distributing those funds was fair and reasonable. The instant case, however, is not a mere "distribution proceeding." The question here is one of priority between two competing judgments. Unless the SEC's judgment has priority over Solution Funding's claim, the SEC will have nothing to distribute.

### 3. The Receivership Cases Cited by the SEC Are Also Not Persuasive

In cases brought by the SEC, courts often appoint a receiver over the corporate defendant in order to conserve the existing estate. *S.E.C. v. Malek,* 397 Fed.Appx. 711, 713 (2d Cir.2010). In some instances, the receiver will also go on to liquidate the estate, with the district court determining the distribution of the proceeds. *Id.* at 714. These receivership proceedings often focus on weighing the competing equitable interests of victimized investors vis-à-vis each other—unlike here, these cases generally do not focus on creditors, particularly secured creditors. *See, e.g., S.E.C. v. Credit Bancorp, Ltd. ("Credit Bancorp I"),* No. 99–cv–11395, 2000 WL 1752979, at *13–19, *34–37 (S.D.N.Y. Nov. 29, 2000), *aff'd, S.E.C. v. Credit Bancorp, Ltd. ("Credit Bancorp II"),* 290 F.3d 80 (2d Cir.2002); *SEC v. Enterprise Trust Co.,* No. 08–cv–1260, 2008 WL 4534154, *3 (N.D.Ill. Oct. 7, 2008); *see also S.E.C. v. HKW Trading LLC,* No. 05–CV–1076, 2009 WL 2499146, at *5 n. 7 (M.D.Fla. Aug. 14, 2009) ("Receivership cases in which a court denies a remedy based on equitable considerations often involve the issue of whether to use a pro rata distribution or a tracing method

when determining the appropriate form of relief for defrauded investors' claims.").

The SEC, however, contends that three receiverships cases support its argument. None of these cases are persuasive.

### i. *S.E.C. v. Byers*

In *S.E.C. v. Byers,* the court held that it had the discretion, in an equitable receivership, to adopt a "fair and reasonable" distribution scheme amongst the unsecured creditors and injured investors that departed from the priorities for unsecured creditors established in the Bankruptcy Code. 637 F.Supp.2d 166, 171, 183 (S.D.N.Y.2009). The plan adopted in *Byers:* (1) allowed secured creditors to recover from their collateral; (2) excluded secured creditors' unsecured deficiency claims from distribution; and (3) allowed other unsecured creditors and defrauded investors to share in the recovery. *Id. Byers,* however, did not limit the claims of secured creditors, and nothing in *Byers* provides support for the SEC's assertion that the "fair and reasonable" standard governs the priority or subordination of secured claims.[8]

### ii. *S.E.C. v. Credit Bancorp*

In *S.E.C. v. Credit Bancorp,* injured investors sought, unsuccessfully, to exclude their assets from the receivership estate. *Credit Bancorp I,* 2000 WL 1752979, at *13–19. In determining the appropriate distribution plan, Judge Sweet stated:

> it will be assumed arguendo that [the injured investors] have valid claims for relief that would entitle them to recover their securities through tracing under the law of contract, the U.C.C., and the law of bailment. Nevertheless, because *equitable concerns may supersede such legal claims to relief,* the tracing remedy will be disallowed unless they can show that it would be equitable.

*Id.* at *34 (emphasis added). The SEC contends that this language from *Credit Bancorp I* stands for the "bedrock principle that equitable concerns may supersede legal claims to relief in SEC distribution proceedings." (SEC Opp'n at 2–3.) However, the district court's statement in *Credit Bancorp I* that equitable concerns can supersede legal claims in an equitable receivership is dicta as: (1) the investors' purportedly "legal" claims were, in fact, equitable claims for restitution through tracing; and (2) whatever "legal" claims the investors possessed failed on the merits. *Credit Bancorp I,* 2000 WL 1752979, at *14–19, *21–26; *Credit Bancorp II,* 290 F.3d at 87–91.

Moreover, subsequent decisions in the *Credit Bancorp* litigation, which explicitly dealt with secured creditors, undermine the SEC's position in the instant action and also confirm that the language cited by the SEC was merely dicta. *See S.E.C. v. Credit Bancorp, Ltd. ("Credit Bancorp III"),* 279 F.Supp.2d 247, 260–61 (S.D.N.Y. 2003); *S.E.C. v. Credit Bancorp, Ltd. ("Credit Bancorp IV"),* 386 F.3d 438, 447 (2d Cir.2004). The same injured investors subsequently sought to recover assets to the receivership estate that were subject to a bank lien. *Credit Bancorp III,* 279 F.Supp.2d at 260. The investors raised an equitable unclean hands argument against the bank, "contend[ing] that in the context of an SEC enforcement action in which a federal equity receivership ha[d] been cre-

---

**8.** It is unclear if *Byers* was: (1) distributing an SEC disgorgement judgment to various investors and creditors; or (2) determining, under the principles of equitable receiverships, the priority of the SEC's disgorgement judgment vis-à-vis the other unsecured creditors. Nota-

bly, *Byers,* which was decided prior to *Bronson Partners,* does not explicitly address this point or state whether all of the assets in the receivership estate were traceable to the defendants' fraud.

ated, equitable principles apply, and the [court] may set aside 'at law' claims such as [the bank's lien]." *Id.* Both the district court and the Second Circuit rejected this argument, explaining that because a receiver takes property subject to all liens, "the U.C.C. and the language of the agreements, rather than the law of federal equity receivership, govern the dispute." *Credit Bancorp IV,* 386 F.3d at 447; *Credit Bancorp III,* 279 F.Supp.2d at 260–61. Accordingly, these decisions do not support the SEC's position here.[9]

### iii. *S.E.C. v. Quan*

Finally, in *S.E.C. v. Quan,* the court denied a secured creditor's request to exclude secured assets from the receivership estate.[10] No. 11–CV–0723, 2013 WL 1703499, at *4 (D.Minn. Apr. 19, 2013). The court concluded that the secured assets at issue could be subject to disgorgement because those assets were allegedly purchased with monies fraudulently obtained from investors. *Id.* In light of the court's decision that the secured assets at issue were subject to disgorgement, the court went on to conclude that if the SEC ultimately obtained a disgorgement judg-

ment, the court would have "broad authority to approve[] a distribution plan that is governed by equitable principles rather than ... legal rules governing priority." *Id.* at *5.

*Quan,* however, is distinguishable. Unlike the instant case, the secured assets at issue in *Quan* were allegedly purchased with monies fraudulently obtained from investors. Moreover, *Quan's* reasoning as to why this fact would permit the court to order "disgorgement" of secured assets and distribution of such assets to investors is not clear.[11] *Id.* at *4. Given the above, *Quan* does not convince me that the Court can employ broad equitable principles to limit Solution Funding's secured judgment in the instant proceeding.

In conclusion, the "fair and reasonable" standard advocated by the SEC and the Lead Plaintiffs is not the appropriate standard for determining the priority of a disgorgement judgment vis-à-vis a competing secured judgment. Accordingly, the Court declines to limit Solution Funding's claims on this ground.

**9.** Decisions from outside the Second Circuit have also rejected attempts to invoke broad equitable principles in order to limit the claims of secured creditors in SEC receiverships. *See S.E.C. v. Mgmt. Solutions, Inc.,* No. 11–CV–1165, 2013 WL 594738, at *1–4 (D.Utah Feb. 15, 2013); *S.E.C. v. Madison Real Estate Grp., LLC,* 647 F.Supp.2d 1271, 1276 (D.Utah 2009); *cf. S.E.C. v. Vescor Capital Corp.,* 599 F.3d 1189, 1191 (10th Cir. 2010). Notably, in *Management Solutions,* the court rejected the SEC's arguments that: (1) secured claims should not be enforced where it was "not equitable or fair in light of the ultimate distribution scheme of the receivership estate"; and (2) an equitable receivership empowers the court to "suspend certain rights ... that would otherwise be available under State law." *Id.* at *1–4. In reaching that conclusion, the court in *Management Solutions,* like the decisions in *Credit Bancorp III* and *Credit Bancorp IV,* relied on long-

established principles applicable in receiverships. *See id.* at *3; *Credit Bancorp IV,* 386 F.3d at 447; *Credit Bancorp III,* 279 F.Supp.2d at 260–61.

**10.** The court's decision in *Quan* does not squarely identify the creditor, DZ Bank, as a secured creditor. However, the parties' briefing and an earlier opinion by the court indicate that DZ Bank possessed both secured and unsecured claims. *See S.E.C. v. Quan,* No. 11–CV–723, 2012 WL 1516977, at *1 (D.Minn. Apr. 30, 2012); DZ Bank's Resp. to Preferred Investors' Mot. to Intervene at 3–4, ECF No. 242, *filed in S.E.C. v. Quan,* No. 11–cv–723 (D.Minn.).

**11.** In the instant case, it is unnecessary to address how such tracing should affect a secured creditor, because the SEC has not argued that the assets at issue were traceable to the fraud.

**550**

## C. Unclean Hands, Breach of Fiduciary Duty and Equitable Subordination Arguments

In addition to the SEC's and Lead Plaintiffs' primary argument addressed above, Metter, the SEC, and the Lead Plaintiffs also argue that Solution Funding's claim should be subordinated or not enforced because Solution Funding was involved in inequitable conduct that includes a breach of fiduciary duty by Pisani Sr. In response to these arguments, Solution Funding maintains that Judge Irizarry's June 20, 2012 Order, which established the instant claims process, precludes any equitable re-ordering of priorities and is limited solely to determining the facial priority of the various claims. As explained below, I agree with Solution Funding on this point. In addition, the attempts by Metter, the SEC and the Lead Plaintiffs to challenge Solution Funding's claim also fail on other grounds.

### 1. Judge Irizarry's June 20, 2012 Order

Judge Irizarry's June 20, 2012 Order directs claimants to file claims setting out the basis of their assertion "of priority over other creditors." (June 20, 2012 Order at 2–3.) Critically, the Order also states that "[c]reditors shall have *the same relative priority* with regard to all proceeds of sale deposited in the CRIS account as they possessed with respect to the assets made to facilitate their sale, or as they possessed with respect to such proceeds prior to their deposit in the CRIS account." (*Id.* at 3 (emphasis added).) This language indicates that the Court cannot alter the claimants' relative priority to the proceeds. Moreover, Solution

Funding's argument is bolstered by the joint motion submitted by the SEC, Solution Funding, and other relevant parties when they asked Judge Irizarry to approve the June 20, 2012 Order, which the parties had proposed to the Court. The joint motion states: "[t]he SEC ... has advised counsel for Solution Funding that it is prepared to cooperate with Solution Funding and other interested parties to ensure that the proceeds of the sale of the assets of [BTR] will be disposed of fairly, appropriately *and in accordance with the current priority among creditors under the governing law.*" (Joint Mot. at 2, ECF No. 233 (emphasis added).) The phrase "current priority" confirms that the June 20, 2012 Order does not allow re-ordering of priorities under equitable subordination. Accordingly, the Court denies the requests of Metter, the Lead Plaintiffs, and the SEC to alter the priority of Solution Judgment's judgment.

In addition, even assuming *arguendo* that Judge Irizarry's June 20, 2012 order does not foreclose subordination, the arguments of Metter, the SEC, and the Lead Plaintiffs fail on other grounds.

### 2. Metter's and the SEC's Unclean Hands/Breach of Fiduciary Duty Arguments

Metter and the SEC contend that Solution Funding's recovery should be limited based on claims, under Delaware law, of "unclean hands and/or breach of fiduciary duty." [12] (SEC Opp'n Mem. at 4.) Both Metter and the SEC simply assume, without citation to any authority, that they have standing to pursue these claims in the instant claims proceeding and that such claims can be invoked to contest the

**12.** Although Metter seeks discovery on these claims, the SEC has not made a similar request for discovery (or a hearing). Moreover, in support of its purported unclean hands argument, the SEC simply cites to evidence submitted by Metter without advancing any specific argument as to why Solution Funding has unclean hands.

enforceability of Solution Funding's judgment against BTR and to limit Solution Funding's recovery. (See Response of Michael Metter to SF Mot. for Distribution ("Metter Opp'n") at 19 ("Solution Funding's efforts to portray the Delaware judgment as enforceable fails ... because the critical issues were actually left unresolved in the prior Delaware action."), ECF No. 283.) BTR raised the same unclean hands claim as a defense to Solution Funding's breach of contract suit in the Delaware Chancery Court. Subsequently, the Receiver elected to enter into a consent judgment with Solution Funding, which was approved by the Delaware Chancery Court. In light of that consent judgment, I fail to see how the SEC or Metter can now raise those same claims to contest Solution Funding's judgment in this claims proceeding.[13]

### 3. The Lead Plaintiff's and Metter's Equitable Subordination Arguments.

The Lead Plaintiffs and Metter also contend that that Solution Funding engaged in inequitable conduct that warrants equitable subordination of Solution Funding's claim. As explained below, these arguments do not provide a ground to subordinate Solution Funding's claim.

■■■■ The doctrine of equitable subordination, which is codified in Section 510(c) of the Bankruptcy Code, empowers bankruptcy courts to subordinate claims and, if necessary, to transfer any subordinated liens to the bankruptcy estate. See In re 80 Nassau Assocs., 169 B.R. 832, 836–37 (Bankr.S.D.N.Y.1994). The principles of equitable subordination are also applicable in receiverships. S.E.C. v. Am. Bd. of Trade, 719 F.Supp. 186, 195–96

(S.D.N.Y.1989) aff'd, 932 F.2d 957 (2d Cir. 1991) (table); see also Norwest Bank Wis. Nat. Ass'n v. The Malachi Corp., Inc., No. 99–CV–40146, 2009 WL 5217660, at *2 (E.D.Mich. Dec. 30, 2009).

■■■■ A party raising a claim of equitable subordination must establish that: (1) the claimant at issue engaged in some type of inequitable conduct; and (2) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant. In re 80 Nassau, 169 B.R. at 837 (citing In re Mobile Steel Co., 563 F.2d 692, 699–700 (5th Cir.1977)). A breach of fiduciary duty is a well-recognized example of inequitable conduct. See In re Hydrogen, L.L.C., 431 B.R. 337, 361 (Bankr. S.D.N.Y.2010). Although the Lead Plaintiffs' and Metter's equitable subordination arguments raise some of the same issues as the state law "unclean hands/breach of fiduciary duty" arguments dismissed above, I assume arguendo that pursuit of these equitable subordination claims is not foreclosed by the consent judgment that Solution Funding obtained in Delaware. Nevertheless, these equitable subordination arguments fail on other grounds.

### i. Metter and the Lead Plaintiffs Waived Any Equitable Subordination Arguments

As an initial matter, both the Lead Plaintiffs and Metter have waived any equitable subordination arguments by not properly and promptly raising them.

In opposing Solution Funding's motion, Metter raised arguments concerning unclean hands and breach of fiduciary duty under state law. His opposition brief, however, did not argue for equitable subordination or cite any authority in support

---

**13.** Metter also raises a meritless argument that Solution Funding's judgment is not enforceable because Solution Funding has not complied with New York law concerning the enforcement of foreign judgments. (See Metter Opp'n at 18–19.)

of this principle. Instead, Metter raised the issue of equitable subordination for the first time in an October 13, 2013 letter that he filed long after the briefing on Solution Funding's motion has been completed. (ECF No. 302.) Accordingly, Metter has waived any claims based on equitable subordination.

The Lead Plaintiffs have also waived arguments based on equitable subordination. Judge Irizarry's June 20, 2012 order directed creditors to file motions setting forth "the amount, nature of and basis of the Requesting Creditor's claim and the basis of the Requesting Creditor's claim of priority over other creditors." (June 20, 2012 Order.) A Requesting Creditor's motion had to include "all judgments, agreements or other documents that the Requesting Creditor relies upon as support for its claim to entitlement of disbursement of proceeds together with a memorandum of law addressing any relevant legal authorities." (*Id.*) Despite these requirements, the Lead Plaintiffs did not raise the issue of equitable subordination or the factual basis for such an argument in their opening brief. Accordingly, the Lead Plaintiffs waived any arguments based on equitable subordination. In any event, as explained below, even assuming that the Lead Plaintiffs have properly raised this issue of equitable subordination claim, they have not established that equitable subordination of Solution Funding's claim is warranted.

Before addressing the substance of the Lead Plaintiffs' equitable subordination arguments, it is necessary to briefly recount the relevant facts surrounding the failed December 2009 settlement and Solution Funding's purchase of the BC Loan.

### ii. Facts Concerning Solution Funding's Purchase of the BC Loan

As noted previously, in December 2009, the Guarantors and BC Media reached a settlement in which the Guarantors were to pay $1.1 million by January 31, 2010–the settlement explicitly required that time was of the essence for this payment. (Tr. of Dec. 4, 2009 SDNY Hearing, Fritz Opp'n Aff.) To pay the settlement, Lazauskas liquidated Spongetech stock from a brokerage account that BC Media had seized. (Dec. 4, 2009 Guarantor Settlement Agreement, Fritz Opp'n Aff. Ex. 10; Dec. 18, 2009 Order on Consent, Fritz Opp'n Aff. Ex. 8; Pisani Jr. Delaware Aff. ¶ 48.) However, by the January 31 payment deadline, the liquidation had only yielded approximately $670,000. (Pisani Jr. Delaware Aff. ¶ 49.)

On January 29, 2010, the Guarantors filed a motion in the Southern District of New York (where BC Media had filed suit against the Guarantors) asking the court to extend the December 2009 settlement's payment deadline to April 30, 2010. (Mot. for Extension of Time, Fritz Opp'n Aff. Ex. 11.) Although Lazauskas held additional stock in accounts that BC Media had restrained, that stock was subject to various restrictions that prevented its sale. (*Id.*) The Guarantors estimated that those restrictions would be satisfied or lifted by April 30, 2010, and that Lazauskas' stock could be liquidated by that date. (*Id.*) On February 17, 2010, BC Media opposed the Guarantors' motion, arguing that, although it was willing to negotiate an extension in good faith with the Guarantors, the settlement agreement was a private contract and its material terms should be not altered by the court. (Feb. 17, 2010 Ltr., Pisani Jr. Sur–Reply Decl. Ex. 5.)

In February 2010, BC Media resumed its challenge to Pisani Sr.'s bankruptcy filing, renewing a motion to convert Pisani Sr.'s bankruptcy case from a Chapter 11 reorganization to a Chapter 7 liquidation. (Feb. 10 Letter, Fritz Opp'n Aff. Ex. 13.)

Pisani Sr.'s son, Pisani Jr., then reached out to Pisani Sr.'s friend, Lanktree, about possibly purchasing the BC Loan and also contacted BC Media about a potential purchase. (Pisani Jr. Delaware Aff. ¶¶ 55–56.) BC Media informed Pisani Jr. that, at the time, there were no substantial prospects of settlement. (*Id.* at 55.)

Initially, a transaction was proposed in which both Lanktree and the Guarantors would become members of Solution Funding and contribute funds (and other consideration) towards Solution Funding's purchase of the BC Loan from BC Media. (Draft SF Term Sheet, Fritz Opp'n Aff. Ex. 14; Pisani Jr. Delaware Aff. ¶ 57.) Metter and Lazauskas, however, declined to participate in the proposed transaction. (Pisani Jr. Delaware Aff. ¶¶ 59–60.)

In March 2010, Solution Funding purchased the outstanding BC Loan from BC Media for $445,000.[14] (SF Loan Purchase Agreement, Fritz Opp'n Aff. Ex. 16; Pisani Jr. Delaware Aff. ¶¶ 61–62.) As part of this transaction, Pisani Sr. contributed $138,000 of funds that were the subject of a dispute with BC Media in his bankruptcy proceeding. (SF Loan Purchase Agreement.) At the time of Solution Funding's purchase in March 2010, the BC Loan had a face value of over $1.5 million. (Pisani Jr. Delaware Aff. ¶¶ 63–64.) Solution Funding assumed BC Media's first position security interest in BTR's assets. (*Id.* ¶ 55 n. 7.) In the purchase agreement between Solution Funding and BC Media, BC Media formally declared that that the December 2009 settlement agreement was in default and revoked the settlement agreement. (SF Loan Purchase Agreement.)

After Solution Funding purchased the BC Loan, nothing further was filed in the action in the Southern District of New York, and the court ultimately dismissed the Guarantors' motion in August 2010. (Pisani Jr. Delaware Aff. ¶ 53.)

### iii. Standard for Equitable Subordination

 Courts define the "inequitable conduct" element of equitable subordination in broad terms, observing that it "encompasses conduct that may be lawful but is nevertheless contrary to equity and good conscience. It includes a secret or open fraud, lack of good faith by a fiduciary, unjust enrichment, or enrichment brought about by unconscionable, unjust or unfair conduct or double-dealing." *In re Verestar, Inc.*, 343 B.R. 444, 461 (Bankr. S.D.N.Y.2006). "Traditionally, inequitable conduct has been found only in cases involving at least one of the following three paradigms: (i) fraud, illegality or breach of fiduciary or other legally recognized duties; (ii) undercapitalization of the debtor; and (iii) control or use of the debtor as a mere instrumentality or alter ego to benefit another." *In re Hydrogen, L.L.C.*, 431 B.R. 337, 361 (Bankr.S.D.N.Y.2010).

 In analyzing an allegation of inequitable conduct, a threshold question is whether the creditor opposing subordination is an "insider" of the debtor. *In re 80 Nassau Assocs.*, 169 B.R. at 832, 839 n. 5 (Bankr.S.D.N.Y.1994). "In the case of non-insider claims, the proponent [of subordination] always bears the burden of proof." *Id.* By contrast, when a party seeks to subordinate an insider's claim, the party must only show "a substantial basis to support the charge of unfairness, the burden shifts to the insider to show the

**14.** Solution Funding has submitted evidence indicating that Lanktree was the only member of Solution Funding. (*See* SF's Sur–Reply at 2–4, ECF No. 298.) The record, however, also contains an unsigned Solution Funding operating agreement that lists both Pisani Sr. and Lanktree as members. (Unsigned SF Operating Agreement, Fritz Opp'n Aff. Ex. 15.)

fairness of his claim." *Id.; accord In re Interstate Cigar Co., Inc.,* 182 B.R. 675, 679 (Bankr.E.D.N.Y.1995), *aff'd sub nom. Interstate Cigar Co., Inc. v. Bambu Sales, Inc.,* 166 F.3d 1200 (2d Cir.1998).

■ Generally, an insider is " 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.' " *In re Die Fliedermaus LLC,* 323 B.R. 101, 111 (Bankr.S.D.N.Y.2005) (quoting *Pan Am Corp. v. Delta Air Lines,* 175 B.R. 438, 499 (S.D.N.Y.1994)); *see also* 11 U.S.C. § 101(31)(B) (setting out non-exhaustive list of persons and entities that qualify as "insiders"). In cases involving insiders, the focus is ordinarily on "the fairness of [the insider's] transactions with the debtor" because the insider exercises some control over the debtor. *In re Mr. R's Prepared Foods, Inc.,* 251 B.R. 24, 28 (Bankr.D.Conn.2000) (quoting *In re N & D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir.1986)) (emphasis added).

### iv. Analysis of the Lead Plaintiffs' Equitable Subordination Argument

The Lead Plaintiffs suggest that an unsigned Solution Funding operating agreement, which lists only Pisani Sr. and Lanktree as members, establishes that Solution Funding is an insider. (Unsigned SF Operating Agreement, Fritz Opp'n Aff. Ex. 15.) I assume *arguendo* that this document raises a factual question concerning Solution Funding' insider status.[15] However, even then, the Lead Plaintiffs, who have not sought any discovery, cannot establish inequitable conduct based on the current record.

The Lead Plaintiffs never identify exactly what Solution Funding and Pisani Sr. did that was unfair. Instead, the Lead Plaintiffs simply assert, in conclusory fashion, that "Solution Funding's conduct is exactly why equitable subordination exists." (Lead Pls.' Reply Mem. at 4, ECF No. 295.) This argument does not persuade me that Solution Funding engaged in inequitable conduct.

At one point in their papers, the Lead Plaintiffs stress the fact that Solution Funding conditioned its purchase of the BC Loan on BC Media declaring the December 2009 settlement agreement to be in default. This, however, was not unfair. The Guarantors were clearly already in default of the settlement agreement. Moreover, no purchaser would have bought the BC Loan for $445,000 without first ensuring that BTR and the Guarantors could not invoke the December 2009 settlement to limit the purchaser's recovery to less than it paid for the BC Loan. It should also be stressed that because the Lead Plaintiffs have not requested any discovery they are left to contend with the current record, which does not indicate that Pisani Sr. breached his fiduciary duty or engaged in any other form of inequitable conduct.

Finally, as Solution Funding points out, given that the Guarantors were already in

---

**15.** This unsigned Solution Funding operating agreement, which was introduced into the current record by Metter, was not before the Delaware Chancery Court when it addressed Solution Funding's motion to appoint a receiver. Notably, in the Delaware action, BTR was represented by the same counsel who currently represents Metter in the instant claims proceeding. Neither Metter nor his counsel have explained why the unsigned operating agreement, which presumably has been in Metter's possession since 2010, was not provided to the Delaware Chancery Court. The unexplained failure of Metter's counsel to introduce this purportedly critical document during the litigation over the appointment of the receiver speaks volumes about this document's probative value.

default of the December 2009 when Solution Funding purchased the BC Loan, the Lead Plaintiffs cannot show any harm—by purchasing the BC Loan, Solution Funding simply obtained the same rights that BC Media previously possessed.[16]

The Lead Plaintiffs' equitable subordination argument is denied.

## D. Claims of the Remaining Unsecured Creditors

### 1. Claims by BTR's Former Counsel

Hinshaw & Culbertson ("Hinshaw") and Ashby & Geddes ("Ashby") (collectively, with Hinshaw, "the BTR Firms") were counsel to BTR during Metter's tenure as President and performed legal services for BTR from January 2012 through October 2012. (Fritz Aff. ¶ 25; Metter Reply Aff. ¶ 4.) In light of BTR's cash flow issues, the BTR Firms agreed to delay payment. (Fritz Aff. ¶ 26; Metter Reply Aff. ¶ 8.) Metter informed the BTR Firms that BTR would pay them once BTR's radio stations were sold. (*Id.*)

The BTR Firms argue that: (1) their services were necessary "operating expenses" of BTR; and (2) they should be paid because the Receiver and the Receiver's counsel were paid out of BTR's assets for providing comparable services. (Metter and the BTR Firms' Reply Mot. at 2, ECF No. 271.) The BTR Firms contend that their fees "are no different than the [Receiver's counsel's] fees." (*Id.*) The BTR Firms, however, fail to establish that they are entitled to any payment.

First, and most importantly, there is an obvious difference between the BTR Firms and the Receiver's counsel—Solution Funding, which holds a secured claim on all of BTR's assets, consented to payment of the Receiver's counsel. Moreover, the BTR Firms do not cite to any authority (involving bankruptcy, receiverships, or otherwise) in support of their argument that their claim constitutes "operating expenses" and that such expenses have priority over a secured claim.

Second, the BTR Firms' failure to provide time records also defeats their request for payment. The BTR Firms apparently performed two different tasks. First, they defended BTR against Solution Funding's suit in the Delaware Chancery Court. (*Id.* at 7.) Second, the BTR Firms dealt with the "day to day demands of dealing with BTR's creditors and assisting" BTR's efforts to sell its assets. (*Id.*) I fail to see why the first category of work would possibly be paid out of Solution Funding's security. With respect to the second category of work, the BTR Firms have not submitted their billing records in order to identify how much time was devoted to those tasks.

Accordingly, the Firms' request for payment is denied in its entirety.

### 2. Metter's Claim for Salary and Vacation Pay

Until the Receiver removed Metter as BTR's President in October 2012, the Court, upon consent of the SEC, permitted Metter to receive a salary. (*See, e.g.,* Mar. 28, 2011 Order.) Metter, however, did not cash three paychecks from March and June 2012, totaling $8,820.60. (Metter Reply. Aff. ¶ 2.) Metter now seeks payment for the uncashed paychecks. Metter also

---

**16.** The Lead Plaintiffs assert, in conclusory fashion, that Solution Finding received an unfair advantage by "construct[ing] a shell game to allege a 'priority' claim for far more than the consideration given." (Lead Pls.' Reply Mem. at 4.) Notably, the Lead Plaintiffs never argue that this alleged harm has any connection to the unsigned operating agreement that they cite in their reply brief.

claims payment for unused vacation time during 2011 and 2012. (*Id.* ¶ 3.)

As an initial matter, Metter has failed to establish that he is entitled to any compensation for unused vacation time. In addition, I fail to see why Metter's failure to cash paychecks that BTR provided to him gives rise to an entitlement of further payment from BTR. Furthermore, even assuming that Metter would otherwise be entitled to compensation from a secured creditor for the uncashed paychecks, Metter faces another hurdle. Solution Funding persuasively argues that it possesses claims against Metter, as a guarantor on the BC Loan, that exceed any payments that might be due to him. First, as part of the March 2010 purchase of the BC Loan, Solution Funding also purchased the Guarantor Judgments from BC Media. The Guarantor Judgments remain unsatisfied in part. (Pisani Jr. Decl. ¶ 9.) Similarly, Metter also has continuing obligations as a guarantor under the BC Loan. Metter has "authorize[d] any attorney to appear in any court of record of New York ... on default in any payment of any installment due [under the BC Loan] ... to confess judgment against [him] in favor of [Solution Funding] for the amount remaining to be paid under [the BC Loan], together with costs of suit and attorney fees...." (BC Loan Agreement § 10.19.) Metter does not respond to Solution Funding's compelling arguments on these points.

I find that, in light of Metter's obligations to Solution Funding, he is not entitled to any payment from the CRIS Account.

### 3. Other Unsecured Creditors

The remaining unsecured creditors consist of two employees, Cohn Birnbaum & Shea P.C. (another law firm), and state and federal taxing authorities. None of these parties are entitled to payment.

Most of these parties have conceded that their claims are not entitled to priority over Solution Funding or have waived any arguments on this point. The IRS concedes that, unless Solution Funding's claim is subordinated, it would have priority over the IRS's claims. (IRS Mem. for Disbursement, ECF No. 320.) The state taxing authorities submitted only proofs of claim and have not advanced any argument for why their claims would have priority over Solution Funding's claim. (Proofs of Claim, ECF No. 309, 315, 325.) Cohn Birnbaum & Shea P.C. concedes that it is merely a general unsecured creditor and offers no additional arguments. (Cohn Birnbaum's Mot. to Distribute, ECF No. 278.) John Patchcoski, a former BTR employee who is represented by counsel, simply argues that he has priority over other unsecured creditors. (Patchcoski's Mem. in Supp. of Claim to Distribute, ECF No. 275.)

The remaining claimant is James Servino, a former employee of BTR, who has filed a claim *pro se.* Servino contends that he is entitled to "performance override compensation" and expense reimbursements. (Ltr. dated Feb. 13, 2013, ECF No. 260.) Servino provides no documentary support for his claims, but contends that BTR's files contain his employment contract with BTR and all approved expense records. The Receiver responds that all of Servino's expenses have been paid. (Resp. of Receiver to Req. for Payment from James Servino ¶ 3, ECF No. 264.) The Receiver admits that Servino has an unpaid contractual claim for override compensation from 2009 totaling $34,096.72. (*Id.* ¶ 4.) Servino also claims unpaid override compensation for 2010, but the Receiver has no written contract to support a claim for the 2010 compensation. (*Id.*)

The standards applicable in bankruptcy court, while not determinative in an equitable receivership, may still "be instructive as to general principles of law or [in] determining what is equitable." *S.E.C. v. Mgmt. Solutions, Inc.,* No. 11–cv–1165, 2013 WL 594738, at *2 (D.Utah Feb. 15, 2013). Section 506(c) of the Bankruptcy Code permits administrative expenses to be recovered from "a secured creditor's collateral if three conditions are satisfied: (i) the expenses are 'necessary' to preserve or dispose of the collateral, (ii) they are 'reasonable,' and (iii) the incurrence of the expenses provided a 'benefit' to the secured creditor." 4 Collier on Bankruptcy ¶ 506.05, (16th ed.2014); 11 U.S.C. § 506(c). "However, "prepetition . . . expenses are generally not recoverable under section 506(c)." *Id.*

Even assuming that the above bankruptcy principles are applicable in the instant proceeding, Servino has not established a right to any recovery. Servino is not entitled to payment on his claims for override compensation from 2009 and 2010 because they pre-date the receivership. With respect to unpaid expenses, the Receiver has indicated that no such claims exist, and Servino has not responded with any specifics regarding that claim. Accordingly, Servino's claims are denied.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that the Court: (1) grant Solution Funding's Motion for Disbursement and award Solution Funding all of the funds in the CRIS Account; and (2) deny the Motions for Disbursement filed by the other claimants.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 6(a), 72. Copies of this report and recommendation were mailed to Servino, counsel for W. Marc Johnson, (*see* Oct. 22, 2014 Ltr., ECF No. 328), and the state taxing authorities who filed claims.

Dated: December 18, 2014.